MENNONITE DEACONESS HOME AND HOSPITAL, INC., A
NEBRASKA CORPORATION, APPELLEE, V. GATES ENGINEERING
COMPANY, INC., A DELAWARE CORPORATION, APPELLANT.

363 N.W.2d 155

Filed February 15, 1985.    No. 83-898.

Gary G. Thompson of Hubka, Kraviec & Thompson, for appellant.

David R. Buntain of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

Krivosha, C.J.

The appellant, Gates Engineering Co. (Gates), appeals from a judgment entered following a jury trial in the district court for Gage County, Nebraska, in favor of Mennonite Deaconess Home and Hospital, Inc., doing business as Beatrice Community Hospital and Health Center (the hospital). The hospital sued Gates for breach of both express and implied warranties regarding a roofing system manufactured by Gates for installation on a building owned by the hospital. The jury returned a verdict in favor of the hospital in the amount of $33,729.29. Gates maintains that the verdict was in error because (1) no express warranties were made by Gates to the hospital and (2) the "goods" sold by Gates to the hospital were not defective and, therefore, no breach of any implied warranties was established. We affirm.

Mennonite Deaconess Home and Hospital, Inc., is the owner and operator of a community hospital in Beatrice, Nebraska. In 1979 the hospital began experiencing leaks from that portion of its roof located above the geriatrics wing. The original flat roof was a built-up compound roof consisting of layers of prestressed concrete, particle board, asbestos insulation, tar paper, and tar and rock aggregate. After attempting to repair the roof for approximately a year and a half, the hospital determined that it was necessary to replace the roof. Joseph Crowley, the hospital's director of environmental services, studied several methods for accomplishing that goal. One possibility was to replace the roof with another built-up compound roof of the type originally installed. A second option was the application of a spray-on material to seal the holes. A third option was a one-ply system available from several sources. The evidence discloses that a one-ply system consists of a rubberlike material which is attached to the outside perimeter of the building. Rubber sheeting is then laid across the roof and sealed where the sheets overlap. A one-ply system is not attached directly to the building except on the outer perimeter. After the rubber sheets are installed, rock ballast is laid on top of the rubber to hold it down.

The appellant, Gates, is a manufacturer specializing in the formulation of products of rubberlike, or elastomeric,

materials, both from synthetic rubber products and natural rubber products. Gates also produces coating materials for corrosion and erosion protection, particularly in the chemical and power industries. It also produces sheet liquid and sealant materials which are used in the construction industry, and, in particular, manufactures a one-ply roofing system.

On December 6, 1979, representatives of the hospital met with David Nece, president of Armstrong Construction Company, and Leonard Russell, a sales representative of Gates. Russell introduced himself, and stated, "I came along with Mr. Nece to show and explain the Gates *single-ply system*." (Emphasis supplied.) During the course of the meeting, there was discussion about the Gates system, the temperature and weather conditions involved, the elasticity of the Gates system, previous installations of the system, and warranties. Russell, the Gates representative, gave the hospital representatives two Gates brochures describing the one-ply roofing system. The first brochure, entitled "GACOFLEX One Ply Elastomeric Roofing Systems," provided in part as follows:

> Gates Engineering combines product technology with knowledgeable personnel to provide you with product *and system selection, system detailing for your specific requirements and field technical assistance.*
>
> Gates' systems service can provide the elements so necessary for a successful roof installation based on one ply elastomeric roofing experience dating back to 1957:
> . Product and System Selection
> . Details for Installation
> . Field Service
> . Registered Systems Contractors
> . 10 Year Warranty

(Emphasis supplied.) The brochure also stated: "3. Workmanship. Work *shall* be completed by a competent, *registered System I roofing contractor* in a manner conducive to good workmanship and overall completion of the specification." (Emphasis supplied.) The evidence discloses that "System I" was a Gates designation identifying the Gates roof. "Registered System I roofing contractor(s)" are those contractors registered and approved by Gates. Therefore,

without Gates' prior approval, one could not become a "registered System I roofing contractor."

The brochure then provided:

WARRANTY PROVISIONS:

Gates Engineering provides *single source responsibility* for roofing and flashing with each roofing system.

Whether roofing new construction or re-roofing on existing structure, each GACOFLEX system requires consideration and approval by Gates' technical staff and installation by a registered system roofing contractor. Under these conditions a 10 year roof warranty is available.

(Emphasis supplied.)

A second brochure given to the hospital by Gates was entitled "Gates Engineering GACOFLEX System I Roofing EPDM loose laid and ballasted one-ply system," and stated in part: "*Gates Engineering* provides single source responsibility for the roofing and flashing system. *Each installation is carefully considered and approved by Gates'* technical staff and installed by a Registered System I Roofing Contractor." (Emphasis supplied.)

At the conclusion of this meeting, and while representatives of both Armstrong and Gates were present, the hospital prepared a contract with Armstrong Construction, providing for the installation of the Gates roofing system. The contract included the following general instruction: "Cover with Gates One Ply (Gaco E-2S) *with Manufacturers Representative Supervision.*" There was also included in the contract a special instruction which provided: "Will Provide Gaco (10) Year Roof Waranty [sic]."

At the conclusion of the meeting, representatives of the hospital, Armstrong, and Gates went up on the hospital roof to look at a number of projections, and in particular an expansion joint about which the hospital had some question. The hospital was assured that the Gates system would handle the problem.

The roofing system was installed by Armstrong in February of 1980 and a field representative of Gates was present on the job for approximately two-thirds of the time it took to install the roof. When the installation was completed, the hospital

withheld 10 percent of the contract price, pending issuance of the 10-year warranty, and paid the balance to Armstrong. On April 24, 1980, an employee of Gates visited the hospital to inspect the installation of the roof. The inspection report contained several pages of observations, conclusions, and recommendations concerning mistakes which were made in the installation of the roof. A copy of the inspection report was sent to Armstrong and given to the hospital. The hospital demanded that Armstrong correct the defects. Armstrong refused to do so. Gates, likewise, refused to correct the problems and further refused to issue the 10-year warranty based upon the fact that the roof was not installed in what Gates described as a good and workmanlike manner.

Within 60 days after the Gates inspection, the hospital experienced problems with water leakage in the area covered by the new roof. Water came in around various projections where the roofing material had not been adequately fastened down. In addition, the overlapping seams of rubber material began pulling apart and water came in to patient rooms and the common area. In September of 1981 the hospital finally decided to purchase a new roofing system from another company and replaced the entire roof. The evidence discloses that the hospital did not learn until at least a year after the roof was installed that Armstrong had never been registered by Gates and had never installed a one-ply roof before.

Before turning to the question of whether there were breaches of express and implied warranties, we turn to the question of whether the transaction upon which suit was brought was a "sale of goods" within the meaning of the Uniform Commercial Code or, rather, was a contract for the rendering of "services." If the transaction was really a contract for services and not a sale of goods, the provisions of article 2 of the Uniform Commercial Code do not apply. The question of whether this is a contract for the sale of goods depends upon an examination of the entire contract. The cases are uniform in holding that the U.C.C. applies where the principal purpose of the contract is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are

merely incidental to the contract, the provisions of the U.C.C. do not apply.

The test for inclusion in or exclusion from the sales provisions is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved. *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974). And in *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384, 1388 (Colo. 1983), the Supreme Court of Colorado said:

> The scope of the contract, however, included not only the sale of goods but also the performance of labor or service. Thus, we must determine whether such a mixed contract qualified as a contract for the sale of goods or, instead, constituted a contract for labor or service outside the scope of section 4-2-201(1), C.R.S.1973.
>
> The performance of some labor or service frequently plays a role in sales transactions. "Goods," however, are not the less "goods" merely because labor or service may be essential to their ultimate use by the purchaser. The mere furnishing of some labor or service, in our view, should not determine the ultimate character of a contract for purposes of section 4-2-201(1) of the Uniform Commercial Code. Rather, the controlling criterion should be the primary purpose of the contract—that is, whether the circumstances underlying the formation of the agreement and the performance reasonably expected of the parties demonstrates the primary purpose of the contract as the sale of goods or, in contrast, the sale of labor or service. We agree in this respect with the following statement in Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974):
>
> > "The test for inclusion or exclusion is not whether (goods and services) are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with

labor incidentally involved (*e.g.*, insulation of a water heater in a bathroom)."

*Accord, e.g., Care Display, Inc.* v. *Didde-Glaser, Inc.*, 225 Kan. 232, 589 P.2d 599 (1979); *Burton v. Artery Co., Inc.*, 279 Md. 94, 367 A.2d 935 (1977); *Meyers v. Henderson Construction Co.*, 147 N.J.Super. 77, 370 A.2d 547 (1977). *See generally* Annot., *Applicability of U.C.C. Article 2 to Mixed Contracts for Sale of Goods and Services*, 5 A.L.R. 4th 501 (1981).

This "primary purpose" test, we believe, is designed to promote one of the expressed statutory policies of the Uniform Commercial Code—"(t)o simplify, clarify, and modernize the law governing commercial transactions."

See, also, *Anthony Pools v. Sheehan*, 295 Md. 285, 455 A.2d 434 (1983); *Boddie v. Litton Unit Handling Systems*, 118 Ill. App. 3d 520, 455 N.E.2d 142 (1983); *Meeker v. Hamilton Grain Elevator Co.*, 110 Ill. App. 3d 668, 442 N.E.2d 921 (1982); *Jandreau v. Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266 (So. Dak. 1982).

We believe that an examination of the contract, the brochures, and the evidence adduced at trial makes it manifestly clear that this contract had as its predominant factor the roofing material manufactured by Gates, and only incidentally involved installation by a contractor approved by Gates. The evidence establishes that the hospital was not simply purchasing a new roof of any type or description. Quite to the contrary, as reflected by the evidence, the hospital determined, after careful consideration, to use the one-ply system specifically manufactured and supplied by Gates. The contract specifically identified the type of roof to be installed and further identified it in such a manner that nothing other than the Gates material could be used. It is clear to us that what was being purchased here was a completed roof of the type manufactured by Gates, though installed by others approved by Gates. We believe that the situation here clearly falls into that category in which courts have uniformly held that the contract was for the sale of goods and covered by the Uniform Commercial Code. Having thus determined that the provisions of the Uniform Commercial Code apply, we turn to the

question of whether there was a breach of an express warranty. Neb. U.C.C. § 2-313 (Reissue 1980) provides as follows:

(1)   Express warranties by the seller are created as follows:

(a)   Any affirmation of fact *or promise* made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)   Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)   Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2)   It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

In *Peterson v. North American Plant Breeders*, 218 Neb. 258, 262-63, 354 N.W.2d 625, 630 (1984), we said:

The existence of an express warranty depends upon the particular circumstances in which the language is used and read. . . . A catalog description or advertisement may create an express warranty in appropriate circumstances. . . . *The trier of fact must determine whether the circumstances necessary to create an express warranty are present in a given case. . . . The test is "whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing as to which they may each be expected to have an opinion and exercise a judgment."*

(Citation omitted.) (Emphasis in original.)

Further, we have said that a warranty is express when the

seller makes an affirmation with respect to the article to be sold, pending the agreement of sale, upon which it is intended that the buyer shall rely in making the purchase. See *England v. Leithoff*, 212 Neb. 462, 323 N.W.2d 98 (1982). In *Fricke v. Hart*, 206 Neb. 590, 595, 294 N.W.2d 737, 739-40 (1980), we said: "A positive statement of a seller of the condition of personal property made during negotiations for its sale which indicates an intention to be bound by the truth thereof and which was so understood and relied upon by the other party, is an express warranty."

Gates agrees that an express warranty may be created in an advertising brochure, but argues that before such warranty may arise, the language in the brochure must evidence a clear intent to create the warranty. Gates then argues that because it was merely selling the roofing material, exclusive of installation, and that because the parties agree that the failure of the roof was the result of poor installation and not defective material, there is insufficient evidence in the record to sustain the verdict of the jury. We believe, in that regard, Gates simply misconstrues the nature of the transaction. The hospital was not contracting for the purchase and installation of any roof. It was, in fact, purchasing a "roofing system" designed, manufactured, and supplied by Gates and installed by persons approved by Gates under its supervision.

The testimony at trial indicates that the Gates representative who was present at the initial meeting with the hospital also considered the contract to be one for a "roofing system" consisting of both the Gates material and the Gates-supervised installation. He testified in part as follows:

> Q. And so when you go to a customer such as the hospital, what you're selling is a system; isn't that right?
> A. Right.
> Q. And what the customer is buying is an installed roof?
> A. Right.
> Q. And part of that installation is the product, and part of it is the manner in which it's installed; isn't that right?
> A. Yes.

Representatives of Gates attempted to explain away the language of the brochures by maintaining that the statements contained in the brochures were the things that an architect or contractor was responsible to perform if a good job was to be accomplished and if the warranty was to be issued. The evidence simply does not support that view, or at least the jury could reasonably find that the evidence did not support that view.

The evidence was sufficient to permit the jury to find that statements made by the Gates representative at the initial meeting were intended to be relied upon by the hospital. One of those statements was that before Armstrong would be permitted to install the roof, it would have to be a registered System I applicator. Unknown to the hospital, Armstrong was not a registered System I contractor.

There was sufficient evidence for the jury to find that through Gates' sales brochures and by reason of statements made by its representative, the roof would be installed by a registered System I roofing contractor and that it was not. The hospital was led to believe that the work would be completed by a competent, registered System I roofing contractor in a manner conducive to good workmanship, and it was not.

Further, the hospital was assured that someone from Gates would be on the roof during installation. Obviously, the point of having a representative of Gates on the roof during installation was not simply to add more ballast to the roof; the point of having a representative from Gates on the roof during installation was to ensure that the material was installed correctly. Yet, notwithstanding the presence of that representative, the record discloses that the installation was defective. There was sufficient evidence for the jury to find that the installation was to be supervised by a representative of Gates to assure a proper installation and that it was not. All of these statements constituted affirmations of fact or promises which constituted express warranties, breached by Gates.

We cannot say as a matter of law that the jury verdict in the case at bar was erroneous. Competent evidence was presented to the jury upon which it could find for the hospital upon the issue of express warranty. That being the case, we must affirm.

A jury verdict will not be disturbed on appeal unless it is clearly erroneous and against the preponderance of the evidence and so clearly contrary to findings that it is the duty of the reviewing court to correct it. See, *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983); *Krug v. Laughlin*, 208 Neb. 367, 303 N.W.2d 311 (1981); *Lintner v. Roos*, 202 Neb. 476, 276 N.W.2d 93 (1979). Further, a jury verdict is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party. All conflicts in the evidence, expert or lay, and the credibility of the witnesses is for the jury and not for the court on review. See, *Kniesche v. Thos*, 203 Neb. 852, 280 N.W.2d 907 (1979); *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973). The finding by the jury that there had been a breach of an express warranty was not error.

We then turn to the question of whether there was a breach of implied warranties. The hospital maintained that Gates breached the implied warranty of merchantability provided in Neb. U.C.C. § 2-314 (Reissue 1980), as well as the implied warranty of fitness, in violation of Neb. U.C.C. § 2-315 (Reissue 1980).

Section 2-314 provides in part as follows:

(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

. . . .

(c) are fit for the ordinary purposes for which such goods are used.

Section 2-315, dealing with the implied warranty of fitness, provides as follows:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an

implied warranty that the goods shall be fit for such purpose.

Once again, Gates argues that because the evidence establishes that the material itself was not defective and, in fact, the damage which resulted was caused by the defective installation and not by the condition of the goods, §§ 2-314 and 2-315 do not apply. We believe that this argument suffers from the same weakness as did Gates' argument regarding the express warranty. The hospital was not purchasing raw material. It was purchasing a roofing system which was partially dependent upon proper installation.

While the requirements of § 2-314, implied warranty of merchantability, are not the same as § 2-315, implied warranty of fitness, the evidence in this case would support a breach of either or both of these sections.

To establish a breach of implied warranty of merchantability, there must be proof that there was a deviation from the standard of merchantability at the time of sale and that such deviation caused the plaintiff's injury. See *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984). In order for the goods to be merchantable under § 2-314, they must be at least such as are fit for the ordinary purposes for which such goods are used. See *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978). The record is without dispute that Gates was to provide the hospital with a one-ply System I roof which would not leak when installed. That, they did not do. This, then, was evidence of a breach of merchantability within the meaning of § 2-314.

The conditions under which a breach of implied warranty of fitness exist are also present in this case. In order for one to recover for a breach of an implied warranty of fitness, the purchaser must prove that (1) the seller had reason to know of the buyer's particular purpose, (2) the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish appropriate goods, and (3) the buyer, in fact, relied upon the seller's skill or judgment. See, *O'Keefe Elevator v. Second Ave. Properties, supra; El Fredo Pizza, Inc. v. Roto-Flex Oven Co., supra; Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 209 N.W.2d 177 (1973).

Once again, we believe that the evidence was sufficient to permit the jury to find all of the necessary elements. Certainly, the jury could find that Gates had reason to know of the hospital's particular purpose for the roof. Likewise, the jury could find that Gates had reason to know that the hospital was relying on Gates' skill or judgment to furnish the appropriately installed roof. Indeed, the hospital told Gates it was. And, finally, the jury could certainly find that the hospital relied upon Gates' skill or judgment. It was only after the hospital was contacted by the representatives of Gates and assured of the quality of the roof that it purchased the Gates roof rather than another one-ply roof.

Again, relying upon the rules earlier noted in this opinion with regard to decisions of a jury, we cannot say that in light of the evidence the jury was in error in reaching its conclusion. For this reason, therefore, the verdict of the jury finding in favor of the hospital and against Gates must be affirmed.

AFFIRMED.