CHARLENE PALMER, INDIVIDUALLY AND AS SPECIAL
ADMINISTRATOR OF THE ESTATE OF DENNIS GALE PALMER,
DECEASED, APPELLANT, V. GLEN FORNEY, M.D., ET AL., APPELLEES.

429 N.W.2d 712

Filed September 30, 1988.   No. 86-626.

Daniel B. Cullan and Gene M. Cullan, of Cullan, Cullan & Morrison, and Michael J. Javoronok, of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, for appellant.

J.L. Zimmerman, of Atkins Ferguson Zimmerman Carney, P.C., for appellee West Nebraska General Hospital.

William P. Mueller and Rita C. Grimm, of McGinley, Lane, Mueller, O'Donnell & Williams, P.C., and William M. Lamson,

Jr., and Patricia A. Zieg, of Kennedy, Holland, DeLacy & Svoboda, for appellees Forney and Myers.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an appeal from the district court for Scotts Bluff County. Plaintiff-appellant, Charlene Palmer, as surviving spouse of her deceased husband, Dennis Gale Palmer, brought this action against defendants-appellees, Glen Forney, M.D., Kent Myers, M.D., and West Nebraska General Hospital. In her petition, plaintiff alleged that her husband had come under the defendants' care on October 29, 1982, after receiving injuries in a car accident. Plaintiff further alleged that her husband died on November 12, 1982, as a result of the negligent "consultation, care, management, and treatment of plaintiff's decedent" by Drs. Forney and Myers, and by the negligence of defendant hospital in not correcting the negligence of the doctors and in not rendering proper care. Defendants separately answered, denied any negligence, and alleged that the decedent's death was caused by the decedent's own contributory negligence. After a trial to a jury, the jury found for the defendants. After plaintiff's motion for a new trial was denied, plaintiff timely appealed to this court. Plaintiff sets out two assignments of error, alleging that the trial court erred (1) "in not discrediting the false testimony of Todd Sorensen, M.D., as a matter of law"; and (2) "in not finding Defendants negligent as a matter of law for the release of [the decedent] from the hospital despite his deteriorating respiratory condition and moderate respiratory failure." We affirm.

The record shows that on the morning of October 29, 1982, Dennis Palmer sustained severe chest injuries, after the vehicle he was operating at 45 miles per hour struck a parked semitrailer truck. Palmer was taken to the emergency room at defendant West Nebraska General Hospital in Scottsbluff. Defendant Dr. Forney was the physician on call. After reviewing Palmer's medical history, various lab tests, and chest x rays, Dr. Forney testified, he placed Palmer in the intensive care unit of the hospital for close observation and to monitor

his cardiac condition. Dr. Forney diagnosed Palmer's condition as follows:

> He had an automobile accident with multiple trauma; he had blunt trauma to his chest and abdomen, either probably a pulmonary contusion or bruising of the lung tissue, he had possible intraabdominal hemorrhage, a blunt trauma to his abdomen with unknown internal injuries. He had chronic bronchitis with a history of tobacco abuse.

The x rays showed that Palmer had at least one fractured rib and partial collapse of the lower lungs. Palmer was placed on supplemental oxygen, given pain medication, and encouraged to cough and breathe deeply to help clean up abnormal secretions. On the day of admission, the blood gas value for arterial oxygen ($PO_2$), or oxygen carrying capacity, of Palmer's blood was 59.9 millimeters of mercury (mm Hg). Testimony established that the normal blood gas measurement is between 70 and 100 mm Hg. After Palmer was placed on supplemental oxygen, his blood gas value improved to 75.2 mm Hg.

After Dr. Forney's initial diagnosis, defendant Dr. Myers joined in the treatment of Palmer. On October 30, Dr. Forney examined Palmer and determined that Palmer was bleeding intra-abdominally and that his ankle was sprained. Palmer's blood gas level on that day was 67.7 mm Hg. The next day Palmer's blood gas level went up to 72.4 mm Hg. Dr. Forney noted that Palmer had possibly contracted pneumonia. On November 1, Dr. Forney noted that Palmer's condition was improving, as Palmer was able to take deep breaths and was able to clear the secretions out of his lungs, and as his abdominal condition had stabilized.

Dr. Myers examined Palmer on November 2 and noted a fever. On November 5, Dr. Forney, after examining Palmer, changed the delivery mode of his respiratory treatment. On November 5, Palmer's blood gas was 53.5 mm Hg while oxygen was being administered. Dr. Forney observed that Palmer's condition was deteriorating, as Palmer was breathing rapidly, was in "lots of pain," and still had a fever. Dr. Forney testified at trial that these symptoms were common complications consistent with his earlier diagnosis. On November 6, Palmer

still had a high temperature. On November 7, Dr. Myers noted that Palmer was walking in the hallway without oxygen but still had a temperature. On November 7, Dr. Forney also saw Palmer but had nothing to add to Dr. Myers' observations. On November 8, Dr. Myers noted that Palmer's temperature was coming down and that his chest was clearing. Dr. Myers ordered Palmer's supplementary oxygen discontinued. Palmer's blood gas on room air (i.e., without supplementary oxygen) was 52.4 mm Hg. On that same afternoon, Dr. Forney discharged the patient. Dr. Forney testified that Palmer's condition on discharge was as follows:

> Mr. Palmer had shown significant improvement, especially over the last several days and at the time I dismissed him, I felt that he no longer needed the nursing care or nursing observation as long as we were able to provide him with close outpatient follow-up, specifically his exercise tolerance was improved, being that he was able to get up and around with less distress. His pain was diminished somewhat, of course, he still had pain. His temperature, especially compared over the last several days, had improved. His chest x-ray and his lung sounds were improving. I can't remember other specific things, but putting the whole clinical picture together along with his laboratory tests and vital signs and his examination and input that I had from the staff, I felt that he was significantly improved and felt that he could be dismissed safely.

Dr. Forney testified as to his final diagnosis on discharge, as follows:

> Final diagnosis was pulmonary contusion syndrome, which refers to the bruised lung and, then, the subsequent pneumonia that had followed, in addition to the chest wall injury, the broken ribs, the bruised chest. The final diagnosis as far as the abdominal injury was the same on admission as dismissal was, blunt trauma to the abdomen with lacerated liver, the diagnosis of sprained ankle was maintained throughout and did not change.

Dr. Forney gave instructions to Palmer on the date of discharge that he was to see Dr. Myers in 2 days, and gave

Palmer prescriptions for pain medication and for an antibiotic. Dr. Forney also instructed Palmer to contact him or Dr. Myers immediately should he begin to experience any problems.

On November 10, Palmer went to Dr. Myers' office for a followup examination. Dr. Myers noted that although Palmer was still experiencing chest pain and "some pain in his leg," he was doing "quite well." Dr. Myers examined Palmer's leg and determined that Palmer had a sore calf on his left leg with incipient phlebitis. Dr. Myers instructed Palmer to use moist heat and to elevate his leg, and gave him a prescription for an inflammatory agent.

On November 12, Mrs. Palmer called Dr. Myers' office and left word for him to call her. When Dr. Myers returned her call before 9:30 a.m., she informed him that her husband was "profoundly short of breath" and was having chest pain and that that condition had existed since the evening before. Mrs. Palmer told Dr. Myers that Palmer had not called the night before because he did not want to be told to return to the hospital. Dr. Myers talked to Palmer over the telephone and told him to get back to the hospital immediately, and then again talked to Mrs. Palmer and told her to return Palmer to the hospital immediately. Palmer apparently died while en route to the hospital as the result of a pulmonary embolism. After resuscitative efforts at the hospital failed, Palmer was pronounced dead in the emergency room. An autopsy showed that a clot had formed in one of Palmer's veins. The clot fatally occluded a major portion of the blood flow to Palmer's lungs. Dr. Forney testified that "pulmonary embolism was not strongly suspected in this situation because everything he had was better explained by his known diagnosis of bruised lung, pneumonia, bronchitis, chest wall injury."

In her first assignment of error, plaintiff contends that the trial court erred in not discrediting the testimony of Todd Sorensen, M.D., as a matter of law. Plaintiff's brief, at page 12, contends Dr. Sorensen, a witness called by the defense, "falsely interpreted" what Palmer's blood gas reading would have been on the date of discharge had Palmer been placed on supplemental oxygen, and alleges: "Specifically, Dr. Sorensen falsely used the A-a gradient equation and subsequently made

false predictions about the decedent's $PO_2$ based on the A-a gradient." Plaintiff contends that Palmer's $PO_2$ could not be determined from an A-a gradient calculation as done by Dr. Sorensen. Dr. Sorensen testified as to his opinion of what Palmer's $PO_2$ would have been had he been on supplemental oxygen on November 8, over plaintiff's objection. This court held in *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979), that under Neb. Rev. Stat. § 27-705 (Reissue 1985), an expert may render an opinion without first disclosing the underlying data upon which that opinion is based. Dr. Sorensen was not directly asked by plaintiff on cross-examination as to his extrapolation of the $PO_2$ from his A-a gradient calculations, although Dr. Sorensen could have been required to explain the basis of his opinion. *Dawson v. Papio Nat. Resources Dist.*, 206 Neb. 225, 292 N.W.2d 42 (1980).

At trial, Dr. Sorensen referred to Palmer's blood gas reading ($PO_2$) on November 5 of 53.5 mm Hg, which was determined while Palmer was receiving supplemental oxygen, and the blood gas reading ($PO_2$) on November 8 of 52.4 mm Hg, which was determined after Palmer's supplemental oxygen had been withdrawn. Dr. Sorensen testified that, considering the impact of the A-a gradient, the blood gas determination on the 8th, the date of discharge, showed improvement compared to the blood gas determination on the 5th. The A-a gradient refers to the ability of oxygen to defuse from the alveoli (the air sacs in the lungs) into the arteries (the blood vessels that carry blood past the lungs). It measures the efficiency of the blood gas exchange.

From an examination of the record, including the exhibits presented by plaintiff, it is clear that the contention most strongly made by plaintiff in connection with the liability issue is that plaintiff's decedent was discharged from the hospital when his condition was worse than when he entered. This contention is based primarily on the facts that, as set out above, Palmer's $PO_2$ was 59.9 mm Hg when admitted and 52.4 mm Hg when discharged.

In answer to the question addressed to him by one of defendants' counsel, "Well, how can you say that [Palmer was improving at the time of his discharge] when his $PO_2$ was the

lowest number it had been during his hospitalization?" Dr. Sorensen responded:

A. Well, taking the $PO_2$ by itself is a little — It's out of context. There were other signs suggesting improvement, like I have just mentioned, the $PO_2$ was in fact the lowest, but what had been seen was that three days prior to that his $PO_2$, I think, was 54. He had been receiving supplemental oxygen at that point, which was not being given on the 8th when that last blood gas determination was made. If you consider the impact of Aa gradient, the $PO_2$, the blood gas determination on the 11th — I'm sorry, on the 8th, actually shows improvement compared to the blood gas determination on the 5th.

In support of his testimony, Dr. Sorensen went on to demonstrate how the A-a gradient could be calculated in clinical practice, but testified that the formula he used was "not precise enough for a physiologist to do an experiment with . . . ."

Dr. Sorensen further testified he did not use the formula in his practice and had not done the equation for "about 15 years" before he testified. As set out above, Dr. Sorensen testified that plaintiff's decedent was improving based partly on the reasoning that the $PO_2$ of 52.4 mm Hg on discharge on November 8 showed an improvement over the $PO_2$ of 53.5 mm Hg on November 5, because the 53.5 mm Hg reading was taken while Palmer was on 5 liters of oxygen and the 52.4 mm Hg reading was taken after the supplementary oxygen had been discontinued. Dr. Sorensen testified that had Palmer been tested on oxygen on the date of discharge the "likely finding would have been more like a $PO_2$ of 70 to 75."

Plaintiff objected to the giving of Dr. Sorensen's opinion on this issue. Her objection was overruled, and Dr. Sorensen's opinion, as set out above, was testified to before the jury. We first note that "[a]bsent an abuse of discretion, a trial judge's ruling regarding the admissibility of expert testimony will not be reversed." *Little v. Gillette*, 225 Neb. 70, 74, 402 N.W.2d 852, 854 (1987); *Sanchez v. Derby*, 228 Neb. 497, 423 N.W.2d 420 (1988). The jury heard all of the testimony. It is apparent the jury found such an assumption could be made. Unless the conclusions of an expert are based on factors that a court

knows are wrong, as a matter of widespread, accepted, public knowledge, a court cannot say that the conclusions of the expert are wrong as a matter of law. The determination of the truthfulness or accuracy of an expert's conclusions is for the jury. In *Little v. Gillette, supra* at 74, 402 N.W.2d at 854-55, we said:

> We have stated in *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 157 N.W.2d 887 (1968), that this court is not a superexpert and will not lay down categorically which factors and principles an expert may or may not consider. Such matters go to the weight and credibility of the opinion itself and not to its admissibility. *Id.* Whether the plaintiff's experts' assumptions regarding duration were the most credible was properly left to the jury.

Plaintiff recognizes the general rule, but contends Dr. Sorensen's conclusions were false, as a matter of law, and that the cause should be remanded for a new trial. In support of her motion for a new trial, plaintiff offered into evidence the affidavits of three physicians. In all three of the affidavits, the physicians concluded that, in their opinion, Dr. Sorensen had offered "false" testimony at trial in regard to his calculations concerning the blood gas results. The trial court overruled plaintiff's motion. Plaintiff in this court contends that Dr. Sorensen's testimony is false in two respects: first, that with the decedent's known blood gas data the A-a gradient could not be calculated and, second, that the medical treatise upon which Dr. Sorensen relied provides contrary to his expressed opinion.

Defendants contend the A-a gradient calculation can be made with the information available to Dr. Sorensen. Dr. Sorensen testified as follows concerning the A-a gradient:

> So the final formula then boils down to . . . the atmospheric pressure minus 47 from water vapor times the percent $O_2$ minus the alveolar $PCO_2$, minus the arterial $PO_2$. Now, in clinical practice you accept a formula like this which is not precise enough for a physiologist to do an experiment with, but it's every bit as precise as the need for clinical medicine.

The affidavits of plaintiff's experts take exception to Dr. Sorensen's calculations in various respects. One expert's

affidavit set out, "The concepts involved, although confusing to laymen such as the Jury, are very basic pulmonary physiology. It is inconceivable that Dr. Sorensen could make such false statements without knowledge of the falsity of such testimony."

Plaintiff also supported her motion for a new trial upon the affidavit of another doctor, who stated that Dr. Sorensen did not use the true alveolar air equation, and who also takes exception with Dr. Sorensen's $FiO_2$ calculation, stating that his "very rough approximation" would be 40 percent rather than 35 percent. This difference of opinion on the calculation of the $FiO_2$ does not render Dr. Sorensen's testimony false as a matter of law.

A third doctor's affidavit set out that Dr. Sorensen's "basic medical facts regarding pulmonary physiology [are] in error."

In his affidavit filed on behalf of defendants in connection with the motion for new trial, Dr. Sorensen stated that he vehemently denied any of his testimony was false, and stated that he based his calculation of the A-a gradient on a simplified version of the equation in Cecil Textbook of Medicine (P. Beeson, W. McDermott & J. Wyngaarden 15th ed. 1979).

Plaintiff argues that Dr. Sorensen "selectively attached medical authorities" to support his A-a gradient calculations. Brief for appellant at 19. Plaintiff alleges that the next page of the medical treatise upon which Dr. Sorensen relied disputes his testimony regarding the A-a gradient. Plaintiff does not point out how Dr. Sorensen's approach is contrary to Cecil in that textbook's entirety. If an absolute contradiction exists, it is an elusive one to nonmedical persons. An allegation that an expert testified falsely will not be sustained on a mere difference of expert opinion, and where opinion evidence of experts is in conflict, it becomes a question for the jury. *Schroll v. Fulton*, 213 Neb. 310, 328 N.W.2d 780 (1983); *Fremont Farmers Union Coop. Assn. v. City of Fremont*, 179 Neb. 576, 139 N.W.2d 369 (1966). As we stated in *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 157 N.W.2d 887 (1968), this court will not sit as a "super expert." It was not error for the trial court to refuse to grant a new trial on the basis that Dr. Sorensen's testimony was false as a matter of law.

Plaintiff also urges that we apply *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 53, 313 N.W.2d 208, 213 (1981), wherein we held: " ' "Where a party without reasonable explanation testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of pending litigation, such evidence is discredited as a matter of law and should be disregarded." ' "

We note, initially, that Dr. Sorensen was not a party to this litigation. Moreover, Dr. Sorensen's testimony concerning the A-a gradient was at least partially initiated by plaintiff's attorney. On plaintiff's cross-examination of the defendant Dr. Forney, Dr. Forney was asked whether he had made an A-a gradient calculation and the importance or purpose of making such a calculation. Plaintiff's assertion that she was surprised by Dr. Sorensen's later testimony concerning the calculation of an A-a gradient is not supported by the record. Dr. Sorensen testified as an expert witness for the defendants. As such an expert, he could testify concerning the A-a gradient. There is no evidence that Dr. Sorensen changed his testimony in any respect. We find the principles of *Momsen, supra*, inapplicable to the case at bar.

Plaintiff also assigns as error the trial court's refusal to hold the defendants negligent as a matter of law. Plaintiff contends that the defendant physicians discharged Palmer when objective test results revealed him to be in a worse condition than when admitted. This conclusion is based in large part on the factors set out above, but doctors testified further that defendants Drs. Forney and Myers were negligent in that they did not perform additional tests, particularly a venogram to rule out venous thrombosis, and in that they failed to administer anticoagulants to plaintiff's deceased.

This testimony was directly contradicted by other medical witnesses. Defendant's experts were a family practitioner and an internist, who testified there was no reason to keep Palmer in the hospital on November 8 because his condition had improved and essentially the same treatment and monitoring could be provided at Palmer's home. Other testimony was adduced that it was not necessary for Dr. Myers to rehospitalize Palmer on November 10 because Palmer, at the time he came to

Dr. Myers' office, was smiling, cheerful, feeling better, and walking without a limp.

There was testimony elicited by both plaintiff and defendants agreeing that a physician does not determine whether to discharge a patient on a single criterion. The family practitioner for defendants, Dr. Stageman, testified that a physician looks at what the hospital can do for the patient if the patient were not dismissed; and if the patient is up and able to get around and take care of himself, if he is eating, drinking, and urinating, if his bowels are moving, and if he is not receiving IVs, supplemental oxygen, or shots, then the physician would be criticized for keeping the patient in the hospital. Defendants' witnesses testified that the defendants did not violate the proper standard of care.

There was sufficient conflicting evidence for the trial judge to submit the issue of negligence to the jury. "Where reasonable minds may draw different conclusions from the evidence, the question of negligence is for determination by the jury." *Mantz v. Continental Western Ins. Co.*, 228 Neb. 447, 451, 422 N.W.2d 797, 801 (1988). "All conflicts in the evidence, expert or lay, and the credibility of the witnesses [are] for the jury and not the court on review." *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 313, 363 N.W.2d 155, 163 (1985).

Plaintiff's assigned errors do not require a reversal of this case. The judgment is affirmed.

AFFIRMED.