MBH, INC., APPELLEE, V. JOHN OTTE
OIL & PROPANE, INC., APPELLANT.
727 N.W.2d 238

Filed January 23, 2007.   No. A-05-292.

Mark A. Fahleson and Glen Th. Parks, of Rembolt Ludtke, L.L.P., for appellant.

Shaylene M. Smith and Bradley T. Kalkwarf, of Kalkwarf & Smith Law Offices, L.L.C., for appellee.

SIEVERS, CARLSON, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

John Otte Oil & Propane, Inc. (Otte), appeals from a judgment of the district court for Lancaster County which awarded $26,605.39 to MBH, Inc., as damages resulting from Otte's breach of a sales contract and $200 to Otte for MBH's breach of the same contract. We conclude that the disputed terms of the contract are sufficiently definite to be enforced. And although we conclude that the trial court erred in applying the Uniform Commercial Code (U.C.C.) to the sales contract at issue, because we conclude that the factual findings reached by the trial court were not clearly erroneous and the trial court awarded proper damages, we affirm.

## BACKGROUND

On September 13, 1996, MBH, doing business under the trade name Hallam Grain Co., entered into a contract with Otte for the sale of Hallam Grain Co., a business that bought and sold grain, chemicals, and fertilizer. MBH agreed to sell Hallam Grain Co. to Otte as an ongoing business. The sales contract provided for the sale of real estate, buildings, fixtures, furniture, equipment, personal property, goodwill, inventory, and other assets associated with the said business. MBH also agreed to sell the name "Hallam Grain Co." to Otte and signed a covenant not to compete as part of the transaction. The contract provided for a purchase price of $430,000 and specified that the transaction was to be closed on or before October 15. The contract allocated the purchase price as follows:

| | |
|---|---|
| Land | $10,000.00 |
| Buildings | $170,000.00 |
| Covenant not to compete | $100,000.00 |
| All personal property, equipment, furniture and fixtures as reflected on attached Schedule "A" | $150,000.00 |
| TOTAL | $430,000.00 |

Paragraph 5 of the contract provided for the sale of certain inventory items as follows:

Seller and Buyer further agree that, at the time of closing, Seller will sell, transfer and convey to Buyer all remaining chemicals, grain, and fertilizer at a price not to exceed the sum of One Hundred Thousand Dollars ($100,000.00). Such sale is to be made after an inventory is taken by Seller and Buyer, of all such chemicals, grain and fertilizer, after the close of business on the day preceding the date of closing.

The contract did not further define "remaining chemicals, grain, and fertilizer," provided no further pricing information for these inventory items, and did not provide any mechanism for calculating the value of these items upon completion of the described inventory.

Additionally, the contract provided:

Seller is the owner of merchantable title to all the property described in [an exhibit] attached hereto and made a part hereof, free and clear of any and all liens, charges, encumbrances, security interests or other burdens of every kind whatsoever, or will release all of such encumbrances at or before the time of closing.

Listed in the exhibit, which was attached to the sales contract and incorporated by reference, were the specific farm implements, facilities, and equipment that were included in the transaction. A grain vacuum was among the items listed in the exhibit.

After the sale was closed, MBH filed a petition against Otte in the district court, alleging that Otte failed to pay MBH for several items of inventory listed in paragraph 5 of the contract, which items had been in Otte's possession after Hallam Grain

Co. was transferred to Otte. Otte filed a demurrer for failure to state facts sufficient to constitute a cause of action, claiming that the sales contract was unenforceable because it was too indefinite, the minds of the parties did not meet at every point, issues were left open for future arrangement, and it was an unenforceable agreement to agree. The district court sustained Otte's demurrer and dismissed the action. In *MBH, Inc. v. John Otte Oil & Propane, Inc.*, No. A-00-287, 2001 WL 880683 (Neb. App. Aug. 7, 2001) (not designated for permanent publication), we held that taken liberally, MBH's petition set forth a cause of action, and therefore, we remanded the cause for further proceedings in accordance with our opinion.

In accordance with our instructions in *MBH, Inc.*, the trial court reinstated MBH's petition. MBH alleged in its second amended petition, filed on November 25, 2002, that it entered into a contract with Otte for the sale of Hallam Grain Co. on September 13, 1996. MBH alleged that on or about October 15, the contract was closed, and that on that same day, MBH provided Otte with a detailed inventory of all the chemicals to be purchased. The amended petition alleged that Otte had had continuous possession of the items listed in the inventory from October 15, 1996, to the time the amended petition was filed and that MBH made repeated attempts at collection but Otte refused to pay. MBH alleged that the value of the chemical inventory is $21,827.39. MBH also alleged that it provided Otte billings representing the amount of anhydrous ammonia and wheat it transferred to Otte and that MBH was due $3,471.50 for the anhydrous ammonia and $3,386.71 for the wheat.

On January 7, 2003, Otte filed an answer admitting that it entered into a contract to purchase Hallam Grain Co. from MBH that contained a provision for the sale of chemicals, fertilizer, and grain after a joint inventory and admitting that MBH "left various quantities of worthless agricultural chemicals on Otte's premises after the closing of the sales transaction," but alleging that Otte requested that MBH retrieve such chemicals and that MBH refused. Otte denied the majority of MBH's other allegations. Otte also filed affirmative defenses and filed counterclaims. Otte alleged in its first and only relevant counterclaim that MBH breached the sales contract by selling Otte a grain

vacuum system that was actually owned by a third party, causing it to be repossessed after Otte failed to make appropriate payment.

A bench trial was held. Relevant testimony and evidence ascertained during the trial will be discussed where pertinent in the analysis section of this opinion. Upon completion of the trial, the court entered judgment. The court held that "the predominant thrust of the sale was the sale of goods and therefore, Article 2 of the U.C.C. applies to the contract between MBH and Otte." The court further determined that a joint inventory of the chemicals, fertilizer, and grain was to occur on the day preceding the close of the sale as a condition to the sale of these items, but that a joint inventory was not taken on the day before the closing. However, the court found that inventories of the chemicals, grain, and fertilizer were taken at or near the time of the sale and that Otte's principal officer and shareholder or his employees were present during the taking of these inventories. The court found that MBH did transfer all remaining chemicals, grain, and fertilizer to Otte at the time of the sale and that Otte "manifested the intent to accept, either indirectly or directly, such items, without the joint inventory having occurred after the close of business on the day before the closing." Therefore, the court held, Otte waived the above-mentioned condition, making "the remaining provisions of the contract . . . enforceable."

In response to Otte's contention that many of the chemicals transferred by MBH were obsolete by the time the sale took place and therefore did not conform to the contract, the court found that the chemicals were still of use to Hallam Grain Co., were not obsolete, and therefore conformed to the contract. The court found that because these items conformed to the contract, Otte did not have the option under the U.C.C. to reject the chemicals. The court therefore concluded that Otte breached the contract by not paying for the chemicals and awarded MBH $21,827.39 in damages. The court also concluded that anhydrous ammonia and wheat were transferred to Otte, that Otte failed to pay for either, and that therefore, Otte was liable to MBH for $3,471.50 for the anhydrous ammonia and $1,306.50 for the wheat.

The court further determined that Otte was entitled to the fair market value of the grain vacuum MBH sold to Otte that was repossessed after the sale. The court awarded Otte $200 because evidence showed that the vacuum was sold for this amount after it was repossessed.

After entry of the trial court's order, Otte timely appeals.

## ASSIGNMENTS OF ERROR

Otte alleges, restated and consolidated, that the trial court erred (1) by finding that article 2 of the Nebraska U.C.C. applied to the contract; (2) in determining the damage amount Otte was entitled to as compensation for the repossessed grain vacuum; (3) by finding that paragraph 5 of the contract was enforceable; (4) by determining that the goods conformed to the contract and therefore not finding that Otte's rejection of the goods was effective; (5) by finding that the condition precedent in paragraph 5 of the contract was waived by Otte; (6) by awarding MBH the value of materials other than chemicals, grain, and fertilizer; and (7) in determining the damage amount for Otte's alleged breach.

## STANDARD OF REVIEW

■ A suit for damages arising from breach of a contract presents an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Anderson Excavating v. SID No. 177*, 265 Neb. 61, 654 N.W.2d 376 (2002).

■ The construction of a contract is a matter of law, and an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002).

■ The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002).

## ANALYSIS

*Applicability of U.C.C.*

■ The Nebraska U.C.C. applies to transactions in goods. Neb. U.C.C. § 2-102 (Reissue 2001). The U.C.C. defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." Neb. U.C.C. § 2-105 (Reissue 2001). If a transaction is not for the sale of goods, the provisions of the U.C.C. do not apply to that transaction. See *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985).

The sales contract at issue provides for the transfer of both goods and nongoods. The goods at issue include furniture, equipment, personal property, and inventory, including chemicals, grain, and fertilizer. The nongoods include real estate, buildings, goodwill, the business' trade name, and the covenant not to compete. We are therefore confronted with a mixed contract and must decide whether the U.C.C. applies.

■ The trial court held that the U.C.C. applied to the sales contract. Otte alleges that this decision was erroneous. While MBH disagrees with Otte's argument, both parties believe that while Nebraska courts have not yet specifically addressed this issue, whether the U.C.C. applies to a mixed contract is a question of law. We agree. We also agree with courts from other jurisdictions that have held that the determination of whether goods or nongoods predominate a contract is generally a question of law. See, e.g., *Linden v. Cascade Stone Co., Inc.*, 283 Wis. 2d 606, 699 N.W.2d 189 (2005) (interpreting nature of contract presents question of law subject to independent review); *Valley Farmers' Elevator v. Lindsay Bros.*, 398 N.W.2d 553 (Minn. 1987) (question as to classification of hybrid contract is generally one of law), *overruled on other grounds, Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990). We therefore engage in an independent review of this issue. See *Reichert, supra.*

■ To determine whether the U.C.C. applies to the transaction in the instant case, we must ascertain the predominant purpose of the transaction.

> The test for inclusion in or exclusion from the sales provisions [of the U.C.C.] is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.

*Mennonite Deaconess Home & Hosp.*, 219 Neb. at 308, 363 N.W.2d at 160. The U.C.C. applies when the principal purpose of a transaction is the sale of goods, but does not apply when the contract is principally for services. See *Mennonite Deaconess Home & Hosp., supra.* The same analysis may be used when a transaction includes the sale of goods mixed with the sale of nongoods, as opposed to services. See *Hammond v. Streeter*, 225 Neb. 491, 495, 406 N.W.2d 633, 636 (1987) ("[i]n the present case, as is often true in the sale of a business, the sale of the Hammond Flying Service involved a mixed sale of goods, such as the runway markers, and nongoods, such as the lease on real estate").

We have found no Nebraska case that is factually similar to the instant case and analyzed whether the U.C.C. applies to the sale of an ongoing business. We therefore look to decisions from other jurisdictions that have addressed this issue in a similar context. Our research reveals that many courts have concluded in their decisions that the U.C.C. does not apply to mixed sales contracts for the sale of ongoing businesses. See, e.g., *Dravo Corp. v. White Consol. Industries*, 602 F. Supp. 1136 (W.D. Pa. 1985); *Morgan Pub., Inc. v. Squire Pub. Inc.*, 26 S.W.3d 164 (Mo. App. 2000); *Stewart v. Lucero*, 121 N.M. 722, 918 P.2d 1 (1996); *D.G. Porter, Inc. v. Fridley*, 373 N.W.2d 917 (N.D. 1985); *Field v. Golden Triangle Broad., Inc.*, 451 Pa. 410, 305 A.2d 689 (1973). Our research also reveals several decisions holding that the U.C.C. was applicable to sales of ongoing businesses. See, e.g., *De Filippo v. Ford Motor Company*, 516 F.2d 1313 (3d Cir. 1975); *Miller v. Belk*, 23 N.C. App. 1, 207 S.E.2d 792 (1974). However, the facts in those cases differed from the facts presented in the instant case, as real estate and goodwill were not transferred in those cases. See *id.*

We find the first line of cases more persuasive. One such case is *D.G. Porter, Inc., supra.* In that case, the parties entered into a contract for the sale of a restaurant. The purchase agreement for the sale involved the transfer of goods, including furniture, equipment, and inventory, and nongoods, including goodwill, a retail liquor license, the assignment of the lease of the business premises, the transfer of fixtures, and the transfer of insurance policies. The court concluded that the transfer of nongoods constituted the essential element of the contract and declined to apply the U.C.C.

In the instant case, we determine that the U.C.C. is inapplicable. The predominant purpose of the contract was the sale of an ongoing business. The essential elements of the contract are nongoods, including real estate, buildings, and goodwill. Several factors lead us to this conclusion. First, the majority of the purchase price is allocated to the purchase of nongoods. This is true even when considering the maximum purchase price for the chemicals, grain, and fertilizer. Second, we believe that the heart of the contract is the goodwill and the real estate. Without the transfer of these things, many of the goods transferred to Otte would be of little or no use. Further, a large part of the goods, including the chemicals, grain, and fertilizer, contemplated in the sale were not itemized in the contract. An inventory of these goods was to occur on the day before the closing. It seems unlikely that elements which are the primary purpose of a contract would remain unspecified until the day before the closing. Viewing the entire contract, the primary purpose was the sale of nongoods.

*Damages for Grain Vacuum.*

Otte argues that while the district court correctly determined that MBH breached the sales agreement by transferring to Otte a grain vacuum that was subsequently repossessed, the court committed reversible error when it awarded an inadequate amount of damages for the breach.

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). In

a case involving a breach of contract, the proper measure of damages is an amount which will compensate the injured party for loss which fulfillment of the contract would have prevented or breach of it has entailed. *Wells Fargo Alarm Serv. v. Nox-Crete Chem.*, 229 Neb. 43, 424 N.W.2d 885 (1988).

The evidence adduced at trial shows that MBH agreed to sell Otte a grain vacuum system "free and clear of any and all liens, charges, encumbrances, security interests or other burdens of every kind whatsoever" and therefore breached this provision of the sales contract when it sold Otte an encumbered vacuum. The court relied on evidence submitted during trial showing that the vacuum was sold for $200 after it was repossessed and awarded Otte $200. Otte submitted evidence that it paid $16,645.13 to replace the vacuum and argues that this amount is the correct measure of damages. However, a former Otte employee testified that he was employed by Otte when it purchased the replacement grain vacuum. He testified that he did not attempt to determine if the balance due on the repossessed vacuum could be paid so that Otte could keep the vacuum. He further testified that the value of the repossessed grain vacuum was substantially less than the value of the replacement vacuum. Otte's principal officer and shareholder testified that he did not attempt to find a vacuum priced lower than the one he purchased for $16,645. We conclude that the trial court's determination of damages was not clearly wrong.

*Paragraph 5 of Sales Contract.*

Otte's third, fourth, and fifth assignments of error relate to the trial court's interpretation of paragraph 5 of the sales contract. Because we determined that the U.C.C. is not applicable, Otte's fourth assignment of error will not be discussed, as it is premised on the assumption that the U.C.C. applies.

Otte first argues that "[p]aragraph 5 lacks any quantity of goods to be sold under the contract and lacks a sale price (or even a method at determining a price); as a result, it is unenforceable according to general contract principles." Brief for appellant at 19-20. Otte elaborates that paragraph 5 is too indefinite to be enforced, creates an unenforceable agreement to agree, and does not evince a meeting of the minds necessary for an enforceable contract. Because MBH seeks to collect damages for a breach of

paragraph 5, we must determine whether paragraph 5 creates enforceable obligations.

We recognize that the construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. See *Solar Motors v. First Nat. Bank of Chadron*, 249 Neb. 758, 545 N.W.2d 714 (1996). A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. *Houghton v. Big Red Keno*, 254 Neb. 81, 574 N.W.2d 494 (1998).

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Id.* It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 252 N.W.2d 142 (1977).

A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). When an agreement stipulates that certain terms shall be settled later by the parties, such terms do not become binding unless and until they are settled by later agreement. *Id.*

When the parties entered into the sales contract on September 13, 1996, the terms of paragraph 5 were not definite. The quantity of goods to be transferred was not defined. The provision contemplated that the specific items to be transferred would be determined by a joint inventory to be performed on the day preceding the closing. The trial court found that the joint inventory did not occur. The terms specified that the price for the items was not to exceed $100,000, but did not further specify how the price was to be determined. Because the parties left elements of this provision for future arrangement, this was not an enforceable contract provision on September 13.

In accordance with the Nebraska Supreme Court's decision in *Nebraska Nutrients, supra*, we continue our analysis to determine

if paragraph 5 became enforceable at any time after September 13. In *Nebraska Nutrients*, the court addressed whether an enforceable contract was created by language that provided in part: " '[The appellant] shall advance, as a loan to [a joint venture he is a party to], a mutually agreed upon sum of money and shall lend his business experience to the venture.' " *Id*. at 752, 626 N.W.2d at 499. The appellant in that case argued that the language at issue constituted an agreement to agree and was unenforceable because an essential term, the amount of the appellant's financial contribution, was left open for future arrangement. The appellees conceded that the " 'mutually agreed upon sum of money' " was a term to be agreed upon at a future time. *Id*.

The court found that the agreement "did not contain the essential term of the amount of funds which [the appellant] would advance." *Id*. at 755, 626 N.W.2d at 501. This conclusion reinforces our decision in the instant case that paragraph 5 was not enforceable when it was created, because the quantity and price of the goods were not specified in the contract.

However, the *Nebraska Nutrients* court continued its analysis. It recognized that an unenforceable agreement to agree may become enforceable when the missing term is subsequently supplied by the parties. See *id*. The court recited the rule that " '[e]ven though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by later verbal clarification or their subsequent conduct that indicates their own practical interpretation.' " *Id*. at 755, 626 N.W.2d at 500-01.

The court then concluded that the agreement became enforceable 35 days after the parties entered into the contract. It became enforceable because at that time, the appellant agreed that he would fund " 'the rest of the construction [needed for the joint venture],' " making his obligation "defined with reasonable certainty." *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 755, 626 N.W.2d 472, 501 (2001). The court elaborated that "the nature and extent of [the appellant's] obligation under the . . . agreement [was defined] so as to provide a standard by which his performance could subsequently be measured." *Id*.

We find that the facts of the instant case are similar to the facts at issue in *Nebraska Nutrients*. In the instant case, the terms of paragraph 5 became enforceable after the closing. The terms became defined by the parties' subsequent actions that indicated their interpretation of the terms. MBH's delivery of chemicals, fertilizer, and grain along with inventories of these items and Otte's acceptance of these items supplied the terms missing from paragraph 5, making it an enforceable provision. This occurred despite the fact that the joint inventory contemplated by the parties was not completed. We further explain our decision in our following response to Otte's argument that the trial court erred when it found that Otte waived the joint inventory as a condition precedent to enforcement of paragraph 5.

Otte argues the trial court correctly found that the joint inventory was a condition precedent to Otte's obligation to purchase the items listed in paragraph 5 and that the condition precedent was not met. Because neither party contests the court's determination, we assume without deciding that performance of the joint inventory was a condition precedent. However, we reject Otte's argument that the court erred when it found that Otte waived this condition.

Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. *Jelsma v. Scottsdale Ins. Co.*, 231 Neb. 657, 437 N.W.2d 778 (1989). In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part. *Id.* A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive. *Id.* Conditions precedent in a contract may be waived. *Pearce v. ELIC Corp.*, 213 Neb. 193, 329 N.W.2d 74 (1982). The general rule is that the assertion of the invalidity of a contract is nullified by the subsequent acceptance of benefits growing out of the contract claimed to have been breached. *Id.*

The trial court found that the "condition precedent found within the contract was waived by [Otte], by [its principal officer

and shareholder's] accepting items without performing a joint inventory with MBH after the close of business on the day before the closing." To reach this conclusion, the trial court considered testimony by two of MBH's officers that Otte's principal officer and shareholder or his employees were present when an inventory of these items was taken, which shows that Otte's principal officer and shareholder was aware of the inventory items that remained at Hallam Grain Co. after the closing for transfer to Otte. There was also testimony that Otte did not inform MBH until many months after the closing that it did not want the chemicals that were left at Hallam Grain Co. Although this was controverted, the trial court resolved this factual dispute adversely to Otte. The court concluded that the evidence demonstrated that Otte manifested the intent to accept, either directly or indirectly, the chemicals, grain, and fertilizer without the joint inventory's having first occurred. This decision was not clearly wrong.

The trial court's resolution of this issue leads us to conclude as a matter of law that the terms of paragraph 5 are binding and enforceable. MBH's creation of inventory lists and transfer of items to Otte and Otte's acceptance of the items supplied the quantity absent from paragraph 5. We find that by accepting the goods, Otte also accepted the prices calculated by MBH at the time the inventory lists were created and billed to Otte.

*Damage Amount for Otte's Breach.*

Otte's final assignments of error pertain to the damages the trial court awarded to MBH for Otte's breach. Otte argues that the district court erred when it awarded MBH $21,827.39 as compensation for Otte's failure to pay for the chemicals transferred to Otte. Otte argues that this amount represents more than the chemicals, including items such as twine, gloves, a tin shed, motors for a " 'station house,' " gasoline, and diesel. Brief for appellant at 31. Otte also argues that MBH failed to meet the burden of establishing the price of the chemicals.

We recognize that the amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Brandon v. County of Richardson*, 264 Neb.

1020, 653 N.W.2d 829 (2002). While the amount awarded to MBH represents more than the price for the chemicals, we find that an award of items beyond the chemicals is supported by the evidence. There was evidence presented that other items were transferred to Otte for which MBH was not paid.

Otte argues that "[t]he only competent evidence in the record establishing the value of the remaining chemicals is that of [an agricultural supplies sales] expert . . . . [He] opined that the remaining chemicals were valued at $3,061.00." Brief for appellant at 31. However, the testimony of another of MBH's officers provides evidence supporting the damage award of $21,827.39. That officer itemized and priced the chemicals at issue. He testified that he prepared the inventory on or about September 8, 1996. He included on the list a chemical inventory and the prices of the chemicals as ascertained by a pricelist provided by the wholesaler from whom he bought the chemicals. He opined that the prices represented the fair market value of the chemicals at the time of closing. Otte did not assign error regarding the receipt of this testimony in evidence. Rather, Otte invites us to substitute our judgment for that of the district court on the issue of credibility. We conclude that the determination of credibility falls within the province of the trial court and that the court awarded MBH an amount of damages that is supported by the evidence.

## CONCLUSION

Paragraph 5 of the sales contract became enforceable when the parties' actions after the contract was created defined the parties' obligations under the contract. While the trial court erred in applying the U.C.C. to the transaction at issue, the trial court's factual findings and damage awards were not clearly erroneous. We therefore affirm.

AFFIRMED.