HILLCREST COUNTRY CLUB, APPELLANT AND CROSS-APPELLEE, V. N.D. JUDDS COMPANY, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLEE AND CROSS-APPELLANT; GEORGIA-PACIFIC CORPORATION ET AL., THIRD-PARTY DEFENDANTS, APPELLEES AND CROSS-APPELLANTS.
HILLCREST COUNTRY CLUB, APPELLANT AND CROSS-APPELLEE, V. GEORGIA-PACIFIC CORPORATION ET AL., APPELLEES AND CROSS-APPELLANTS.
461 N.W.2d 55

Filed September 28, 1990.   No. 88-738.

Rollin R. Bailey, of Bailey, Polsky, Cada, Todd & Cope, for appellant.

Dana V. Baker, of Barney, Carter, Johnson & Baker, P.C., for appellee N.D. Judds Co.

Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, for appellee Georgia-Pacific Corp.

Robert L. Bals, of Nelson & Harding, for appellee David Bear, Inc.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

## I. INTRODUCTION

This appeal arises out of the consolidated bench trials of two suits filed by appellant, Hillcrest Country Club, because of the partial failure of its clubhouse roof.

In the first suit (district court for Lancaster County Docket 391, Page 21), Hillcrest alleges that the installer of the roof, appellee N.D. Judds Company, breached its contract with Hillcrest by failing to honor certain warranties. Judds in turn filed a third-party action against appellee David Bear, Inc., the distributor which supplied Judds with the roof; Roof Systems, Inc., the manufacturer of the roof; Pre-Finish Metals, Inc., which laminated the steel from which the roof was made with an acrylic film for Roof Systems; and appellee Georgia-Pacific Corporation, the manufacturer of the acrylic film. Bear cross-petitioned against Pre-Finish and Georgia-Pacific. By the time of trial, bankruptcy proceedings were pending against Roof Systems, and all matters against it were either stayed or dismissed without prejudice. After this court obtained jurisdiction, all issues involving Pre-Finish were dismissed by action of the parties.

So far as relevant to this appeal, Hillcrest avers in its second suit (district court for Lancaster County Docket 391, Page 22) that Bear and Georgia-Pacific each breached certain warranties, and Bear again cross-petitioned against Georgia-Pacific.

All parties have treated the transactions involved in this appeal as being for the sale of goods controlled by this state's Uniform Commercial Code. In the first suit, Hillcrest obtained a $33,043.20 judgment against Judds, and Judds was given a like judgment against Bear. Judds' third-party action and Bear's cross-petition against Pre-Finish and Georgia-Pacific were dismissed. Hillcrest's petition and Bear's cross-petition in the second suit were dismissed.

Hillcrest has appealed. Bear and Judds have cross-appealed, as has Georgia-Pacific, notwithstanding the fact that no judgment was entered against the latter. It is Georgia-Pacific's position on cross-appeal that the trial court erred in admitting the testimony of a Hillcrest witness and erred in failing to direct

a verdict in favor of Georgia-Pacific on the issues of liability, damages, indemnity, and contribution. We, however, do not concern ourselves with Georgia-Pacific's cross-appeal because, as explained in part III(4) below, the evidence in any event fails to impose any liability upon it.

The various remaining operative assignments of error asserted by the parties which are relevant to the dispositive issues question, in summary, whether the trial court erred in determining (1) the existence and scope of certain warranties; (2) that the contract provisions between Hillcrest and Judds do not shield Judds from liability to Hillcrest; (3) that Bear's liability to Judds is not time barred; (4) that Georgia-Pacific had no liability; and (5) that Hillcrest proved damages, and in assessing the amount thereof.

We affirm in part and in part reverse and remand for a new trial solely on the issue of damages.

## II. FACTS

Under the terms of its lease, Hillcrest was required to replace the then-existing roof on its clubhouse with a new, high-quality and long-lasting one. In compliance with this lease provision, Hillcrest negotiated the replacement of the old roof with Judds, a contractor. During these negotiations, Judds supplied Hillcrest with a brochure describing a roof, called the RS-18, produced by Roof Systems. The RS-18 is made of galvanized steel laminated with an acrylic film, called Korad.

There is some dispute as to who gave Judds the brochure. Dennis O'Kelly, an employee of Judds, testified that Judds initially contacted Roof Systems after seeing an ad in a trade publication and that Roof Systems put Judds in contact with a distributor, Bear. O'Kelly testified that Judds had no further contacts with Roof Systems and that Judds received no materials from Roof Systems. Indeed, this was the first time Judds had ever dealt with the RS-18 roof. He further testified that although he did not recall how Judds received the Roof Systems brochure, it was not received until some time after Judds contacted Bear. John McKinney, another Judds employee, also testified that he believed the brochure came from Bear.

However, Rick Langill, the Bear employee who dealt with Judds, testified as to his "habit" of stamping any brochure he sent out with the Bear corporate name and logogram and that he would keep a copy of the cover letter he would send with the brochure in his files. There is no such stamp on the brochure, and Langill testified that there was no cover letter in his files which would indicate that he had sent the brochure to Judds. Langill also testified, however, that it was possible that such a cover letter could have been misfiled or the brochure sent without a stamp.

The brochure stated that the RS-18 was available in a Korad finish and that "all finishes carry a 20-year warranty." Below the statement about the warranty, there is an illustration of a "specimen warranty" measuring approximately $1^3/_4$ by $2^1/_2$ inches.

Judds' president could not recall what role the brochure played in the formulation of Judds' bid. O'Kelly, however, recalled relying on the brochure's statements regarding the roof's design and the Korad finish.

Georgia-Pacific manufactured the Korad film and had prepared a "Spec-Data" sheet for use in its advertising. This specification sheet, which was attached to the brochure, reads in relevant part:

> KORAD® 2 Acrylic Film and KORAD® Acrylic Film (Standard)—maintenance-free, long-life coatings for exterior metal panels.
>
> . . . .
>
> . . . KORAD® acrylic films are thick, extremely weatherable, mar-resistant, pigmented acrylic plastic films . . . for use as a coating on exterior metal panels where virtual maintenance freedom is desired. KORAD films assure freedom from chalking, fading, chipping, peeling or other forms of coating deterioration. . . .
>
> . . . .
>
> Outdoor exposure—no noticeable chalking, fading, loss of adhesion or other coating deterioration after sixteen years (as of January 1979). . . .
>
> . . . .
>
> **Application:** KORAD is bonded to either metal coils or

sheets before forming. Bonding is performed by qualified coaters using recommended cleaners, pre-treatments, adhesives, heat and pressure (see diagram below). The KORAD surfaced metal is then post formed without fracture (see photos #3 and #4) by roll forming or break-forming techniques.

. . . .

Cost: Although warrantied for 20 years KORAD® 2 acrylic film is competitively priced to standard 10 year coatings. . . .

### 7. GUARANTEE/WARRANTY

A 20 year warranty for both KORAD® 2 and Standard KORAD® is available from panel and building component manufacturers. For warranty information, contact your panel supplier or KORAD Incorporated.

Judds submitted to Hillcrest a letter dated December 11, 1981, along with proposals for two types of roofs and a contract form. The letter recommended the RS-18 over the alternative roof, giving as one reason that "[t]he paint" on the recommended roof "will provide 20 years of wear." Hillcrest chose the roof Judds recommended and contracted with Judds to replace the existing roof with the RS-18. Hillcrest's president, Jack Herbert, testified that he relied on the brochure, Georgia-Pacific's specification sheet, and Judds' recommendation. Hillcrest board members W.B. Brown and Carl Glen testified that the board relied on the recommendations of board members Herbert and Merlin George, who were in charge of the reroofing project and were themselves in the construction business, as well as on the brochure and aforesaid specification sheet.

The contract between Hillcrest and Judds provides, in relevant part:

10.4 [Judds] warrants to [Hillcrest] . . . that all . . . Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these requirements may be considered defective.

. . . .

15.5 The making of final payments shall constitute a

waiver of all claims by [Hillcrest] except those arising from . . . (2) faulty or defective Work appearing after Substantial Completion, (3) failure of the Work to comply with the requirements of the Contract Documents, or (4) terms of any special warranties required by the Contract Documents. . . .

. . . .

19.1 [Judds] shall promptly correct any Work . . . defective or . . . failing to conform to the Contract Documents whether observed before or after Substantial Completion . . . and shall correct any Work found to be defective or nonconforming within a period of one year from the Date of Substantial Completion . . . or within such longer period of time as may be prescribed by law or by the terms of any applicable special warranty required by the Contract Documents. The provisions of this Article 19 apply to Work done by Subcontractors as well as to Work done by direct employees of [Judds].

Article 6 of the contract undertakes to list the "Contract Documents," but no such list is included. "Contract Documents" are defined in article 7 as "this Agreement with General Conditions, Supplementary and other Conditions, the Drawings, the Specifications, all Addenda issued prior to the execution of this Agreement, and all Modifications issued by the Architect after execution of the Contract . . . ." Article 21 states, in pertinent part, "[a]ll contract items per quatation [sic] dated 12-11-81," and bears the initials of Judds' president.

Bear sold the RS-18 roof panels to Judds, and the subcontract agreement between them recites that the materials Bear was to supply were to be in accordance with the "standards of the manufacturers." Bear had purchased the panels from Roof Systems, which had had Pre-Finish laminate them with the Korad acrylic film manufactured by Georgia-Pacific. Roof Systems supplied Pre-Finish both the Korad and the steel to which it was laminated.

Installation of the new roof was completed in July 1982. In November or December 1983, Hillcrest's employees noticed that the roof panels were flaking. Hillcrest orally notified Judds of the problem and then, on September 4, 1984, notified

the remaining parties.

A witness testified that in his opinion ultraviolet light from the sun caused the Korad to lose its elasticity, which in turn resulted in the failure of Korad's bonding with the steel panels.

James Stange, an architect and member of Hillcrest, whose "professional function" was to design roofs rather than to build or replace them, testified on his club's behalf that it would be necessary to replace the existing panels in order to correct the situation.

Henry Buis, a general contractor in the construction business since 1956, apparently gave Hillcrest a bid in the summer or fall of 1988 to replace the roof. He was not aware of anyone in the construction industry who recoats metal roofs, nor did he investigate to see whether recoating was feasible. His bid of $79,500 was for installing a new roof system onto the existing system. This new roof was made by a different company and coated with a different brand of film, but it would have had a similar, although not identical, 20-year warranty.

A second contractor called as a witness by Hillcrest, Walter Broer, testified that he obtained three bids for recoating the Hillcrest roof, that none of them carried a warranty for more than 3 years, and that it was his opinion that the only way to give Hillcrest a roof of "like value" to that warranted would be to replace the existing roof with a new one.

Georgia-Pacific called Larry Holmes to testify as to the cost of recoating the roof at Hillcrest with an acrylic. Holmes had several years' experience recoating metal roofs with acrylic, but had been an owner of his own business for only about a year and a half when he testified. On May 11, 1987, he submitted a bid to strip, clean, prepare, and recoat the roof with an acrylic finish for the amount of the judgment Hillcrest obtained against Judds and Judds obtained against Bear.

### III. ANALYSIS
#### 1. NATURE AND EXTENT OF WARRANTIES

The first summarized assignment of error questions the trial court's rulings concerning the extent and scope of warranties flowing from Judds to Hillcrest and from Bear to Judds.

## (a) Judds' Warranties to Hillcrest

Judds challenges the trial court's finding that it gave an express warranty to Hillcrest and breached it, as well as the implied warranty of merchantability arising from the transaction.

The existence and scope of an express warranty under the Uniform Commercial Code ordinarily are questions to be determined by the trier of fact. *Peterson v. North American Plant Breeders*, 218 Neb. 258, 354 N.W.2d 625 (1984); Neb. U.C.C. § 2-313 (Reissue 1980). Inasmuch as the trial court was the finder of fact, its factual findings will not be set aside unless clearly wrong. *Howells Elevator v. Stanco Farm Supply Co.*, 235 Neb. 456, 455 N.W.2d 777 (1990).

According to § 2-313, an express warranty is created by any description of the goods which is made part of the basis of the bargain, or by any affirmation of fact or promise relating to the goods that is made by the seller to the buyer and which becomes part of the basis of the bargain. Judds' statement that the paint (that is to say, acrylic finish) would provide 20 years of wear is an affirmation of fact relating to the RS-18 roof system, and it was made by Judds as the seller to Hillcrest as the buyer. The question therefore becomes whether there is sufficient evidence that Judds' statement became part of the basis of the bargain.

This court has held that "[s]ince an express warranty must have been 'made part of the basis of the bargain,' it is essential that the plaintiffs prove reliance upon the warranty." *Wendt v. Beardmore Suburban Chevrolet*, 219 Neb. 775, 780, 366 N.W.2d 424, 428 (1985). In the cases before us, the trial court expressly found that Hillcrest relied on the statement in Judds' letter.

Judds disagrees, arguing that rather than relying on its statement, the Hillcrest board relied instead on the Roof Systems brochure, the Georgia-Pacific specification sheet, and Herbert's and George's personal knowledge. Herbert believed that both he and George, who had died before these cases came to trial, relied on the various materials given to them by Judds, as well as upon their own experience.

Board member Brown testified that he and the rest of the board relied on the recommendations of Herbert and George.

Board member Glen also testified that he and the rest of the Hillcrest board relied on Herbert's and George's recommendations.

The testimony of Herbert, Brown, and Glen is sufficient to support the trial court's finding that the board, through its reliance on Herbert, relied on Judds' affirmation. That being so, the first summarized assignment of error fails as to Judds without our needing to determine whether the evidence also supports the trial court's finding that Judds breached its implied warranty of merchantability.

### (b) Bear's Warranty to Judds

Bear questions the trial court's finding that Bear breached its express warranty to Judds that the finish on the RS-18 roof would wear for 20 years.

The trial court's determination in this regard is based on its findings that the Roof Systems brochure was given to Judds by Bear and that the statement in the Roof Systems brochure that "all finishes carry a 20-year warranty," together with the Bear-Judds subcontract provision that "[a]ll the above materials [are] to be in accordance with the standards of the manufacturers," constituted an express warranty running from Bear to Judds.

Bear essentially raises three objections: First, that there was no competent evidence that Bear supplied Judds with the materials the latter relied upon; second, that even if Bear did supply the materials, there is no evidence that Bear adopted Roof Systems' warranty as its own; and finally, that even if Bear did adopt Roof Systems' warranty, the terms of the "specimen warranty" contained in the brochure work to shield Bear from liability to Judds.

O'Kelly's testimony was such that the trial court could have deduced that since Bear and Roof Systems were the only entities with which Judds dealt in regard to the RS-18 roof, and since Roof Systems did not send Judds any materials, Bear supplied the brochure. The trial court as the trier of fact was free to disregard or to give little weight to Bear's evidence that it was Langill's "habit" to stamp all brochures he sent out with the corporate name and to file a copy of the cover letter

accompanying such brochures.

Bear's next argument is that the mere fact that Bear supplied the brochure to Judds, even when coupled with the subcontract provisions, is insufficient to establish that Bear adopted Roof Systems' warranty.

While it has been held that a seller does not adopt a manufacturer's express warranty merely by giving notice of that warranty, *State v. Patten*, 416 N.W.2d 168 (Minn. App. 1987), even when that notice was contained in the buyer's purchase agreement, *Gilliam v. Indiana Nat. Bank*, 337 So. 2d 352 (Ala. App. 1976), and *Cochran v. McDonald*, 23 Wash. 2d 348, 161 P.2d 305 (1945), adoption does arise where a seller makes an affirmation about the manufacturer's warranty by means of a statement of fact, a promise, or some action which would tend to induce the buyer to purchase the goods, *Richards v. Goerg Boat & Mtrs. Inc.*, 179 Ind. App. 102, 384 N.E.2d 1084 (1979), and *Scovil v. Chilcoat*, 424 P.2d 87 (Okla. 1967). We so ruled in *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973), *overruled on other grounds, National Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983). Therein, we stated that the lessor of a scaffold who stamped the manufacturer's brochure with the lessor's name and mailed it to potential users of such equipment adopted the manufacturer's warranty as the lessor's own.

Here, the evidence supports a finding not only that Bear sent Judds the Roof Systems brochure but that Bear covenanted in its subcontract with Judds that the roof would meet the manufacturer's standard, that is, that the finish carried a 20-year warranty. In view of those circumstances, it cannot be said that the trial court's finding that the interplay between the brochure and the Bear-Judds subcontract provisions was such that Bear made its own warranty to Judds is clearly wrong.

Bear's final argument centers on the trial court's alleged error in "totally ignoring" the "terms" contained in the "specimen warranty" reproduced in the Roof Systems brochure. This specimen, covering a $1^3/_4$- by $2^1/_2$-inch space as described in part II above, contains enough text to fill a standard $8^1/_2$- by 11-inch typewritten page and is unreadable by the naked eye. Text that small, particularly when compared to the surrounding

text touting the 20-year warranty, is ineffective to limit the express warranties made in the brochure. The party formulating a contract will not be permitted to so fashion it as to mislead the other party by setting forth a clearly apparent promise or representation in order to induce acceptance and then designedly burying elsewhere in the document, in fine print, provisions which purport to limit or take away the promise or preclude recovery for the failure to fulfill it. *Seal v. Tayco, Inc.*, 16 Utah 2d 323, 400 P.2d 503 (1965).

Bear seems to think that consideration of these minute terms is necessary because "[i]t is meaningless to know that a warranty exists if one does not know what is being warranted." Brief for appellee Bear at 14. The short answer to this is that one knows what is warranted by the terms of the brochure and the specification sheet it contains, i.e., that the roof finish is warranted against, among other things, flaking.

Bear attempts to analogize its situation to that found in *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979), where this court rejected plaintiff's contention that a 20-year repair bond on a roof was an explicit, express warranty regarding the future performance of the roof. However, the only similarity between *Grand Island* and the cases under review is that all three involve a roof. We are not here being asked to convert a promise of future repairs into a warranty that the roof would last 20 years but, rather, to interpret the meaning of words which relate specifically to future performance.

Consequently, the first summarized assignment of error fails as to Bear as well.

## 2. JUDDS-HILLCREST CONTRACT PROVISIONS

In the second summarized assignment of error, Judds urges that several provisions in its contract with Hillcrest, when taken together, limit Judds' liability to defects discovered within 1 year of substantial completion of the contract and that Hillcrest's final payment acted as a waiver of Hillcrest's claims against Judds. Judds asserts that the terms of the contract are unambiguous, that as such their meaning presents a question of law, not fact, and that we must come to an independent

conclusion on matters of law. Judds is correct in its statement of the standard of review for unambiguous contracts. See *Central States Health & Life v. Miracle Hills Ltd.*, 235 Neb. 592, 456 N.W.2d 474 (1990). The question is whether this standard is applicable in these cases and, if so, whether it helps Judds.

Judds first argues that articles 10.4 and 19.1 of the contract limit its liability to defects found within 1 year of substantial completion. It asserts that the clause in article 19.1 allowing a longer period for special warranties is not applicable because the "20-year" language contained in its quotation to Hillcrest is not a part of the contract documents. The trial court, however, specifically found that Judds' letter of December 11, 1981, and the materials accompanying it constituted Judds' bid or quotation and that the quotation "was made a part of the contract . . . ." Does the evidence support the trial court's finding of incorporation?

The contract made reference to the "quatation [sic] dated 12-11-81." The quotations, bids, or proposals were sent under the same cover as the letter containing the affirmation, and all were written on the same stationery, although only the page with the recommendation and affirmation was dated or addressed. Herbert also testified that the letter was attached to the contract when it was signed, and the letter and proposals are still attached to the contract. These facts, when coupled with those which support the finding that Judds made an express warranty discussed in part III(1)(a) above, are sufficient to establish that the trial court did not commit clear error in finding that the 20-year language used in Judds' letter was incorporated into the contract documents.

The critical question, then, is whether the 20-year language constitutes a special warranty contemplated by article 19.1. Unfortunately, the contract does not define "special warranties," and there is a dearth of enlightening case law on the subject. The contract itself contains several warranties of general application to the construction industry, such as that all materials will be new unless otherwise specified, that the work will be of good quality and conform to the contract documents, and that it will be free of faults and defects. Under these circumstances, we conclude that the term "special warranty

required by the Contract Documents," found in article 19.1, refers to those warranties which are specific to the project under contract, as opposed to those warranties which are of general application in the construction industry. Thus, Judds' warranty fits into the "special warranties" exception of article 19.1, and its argument in this regard comes to naught.

Judds next argues that Hillcrest's final payment operated as a waiver of its claims against Judds under article 15.5 of the contract. However, this argument overlooks the fact that article 15.5, like article 19.1, contains an exception for special warranties. It seems fatuous indeed to suggest that article 15.5 waives warranties of future performance when that performance must necessarily occur after final payment.

Consequently, there is no merit to the second summarized assignment of error.

### 3. No Time Bar

In the third summarized assignment of error, Bear contends the trial court erred in failing to find that its express warranty to Judds was not barred by the 4-year limitation of Neb. U.C.C. § 2-725 (Reissue 1980).

That statute provides that an action for breach of contract must be brought within 4 years after the cause of action has accrued and that a cause of action accrues when the breach occurs. It further provides that a breach of warranty occurs when tender of delivery is made, except where the warranty extends to future performance of the goods and discovery must await the time of such performance, in which event the cause of action accrues when the breach is or should have been discovered.

In view of the trial court's finding that Bear's warranty extends to the future performance of the roof, the language of § 2-725 itself establishes that even if Judds' action against Bear were for the breach of Bear's express warranty, it is not time barred.

More specifically, however, Judds' action against Bear is, in reality, one for indemnity. This court recently, in *City of Wood River v. Geer-Melkus Constr. Co.*, 233 Neb. 179, 444 N.W.2d 305 (1989), determined that § 2-725 does not apply to a party

seeking indemnification on a contract of sale. The rationale behind this is simple: A party seeking indemnification has no injury to complain of until he or she suffers a loss. If the period of limitations were to start running when the underlying warranty is breached, a party could be foreclosed from indemnity through no fault of his or her own.

Accordingly, the third summarized assignment of error is without merit.

### 4. NONLIABILITY OF GEORGIA-PACIFIC

In this fourth summarized assignment of error, Hillcrest, Bear, and Judds all argue that the trial court's finding that Georgia-Pacific made express warranties with respect to the qualities of Korad film, when coupled with the fact that the film flaked off the roof, is sufficient to establish Georgia-Pacific's liability. They take issue with the trial court's conclusion that since no "defect" in the Korad was proved, there is no evidence that the Korad or Georgia-Pacific's instructions for laminating the Korad were the proximate cause of the flaking.

The parties questioning the trial court's resolution of this issue focus on that court's use of the term "defect," and contend that the only defect the product need have is its failure to meet the express warranty. We agree; indeed, contrary to Georgia-Pacific's view, we so held in *Delgado v. Inryco, Inc.*, 230 Neb. 662, 433 N.W.2d 179 (1988). Therein, plaintiff's fingers were amputated when a hydraulic jack the defendant had furnished allegedly slipped. Plaintiff claimed that the slippage constituted a breach of the defendant supplier's warranty that the jack was merchantable and fit for the activity for which it was to be used. In affirming the trial court's dismissal of plaintiff's action, we observed that if in fact the jack had slipped, there was no evidence as to what caused it to do so. We explained:

> In order for a plaintiff to recover on a breach of express warranty, he must show, among other things, that "the goods did not comply with the warranty, that is, that they were defective, and that his injury was caused by the defective nature of the goods."

*Id.* at 666-67, 433 N.W.2d at 183, citing *Durrett v. Baxter*

*Chrysler-Plymouth, Inc.*, 198 Neb. 392, 253 N.W.2d 37 (1977). Thus, the only defect needed to establish a breach of express warranty is the failure of the goods to conform to the terms of the warranty. The parties' focus on the word "defect" in these cases is misleading; the trial court's use of the term must be read in context with its findings that there was "no evidence that the Korad film . . . would not wear for the length of time represented *if properly applied*" and that "the *defect in the bonding* of the Korad film was present when the panels left the control of Pre-Finish." (Emphasis supplied.) Thus, when the trial court wrote that there was no evidence of a defect in the Korad, it meant that there was no evidence that the delamination was attributable to the Korad itself. In other words, it was not the Korad itself which failed but, rather, the bonding or laminating process.

The real issue that is being argued is not whether a "defective product" needed to be shown but, rather, what exactly Georgia-Pacific warranted. If the warranty is only of the performance of the Korad itself, or properly laminated Korad, then Hillcrest, Judds, and Bear must show that the delamination was proximately caused by the Korad. If it was the performance of bonded Korad, or Korad-coated steel, that was warranted, then the bonding would be a part of the warranty, and the failure of the bond would be sufficient to establish a breach.

The trial court's factual finding that Georgia-Pacific warranted only the Korad film itself cannot be said to be clearly wrong, and, thus, the fourth summarized assignment of error is without merit.

### 5. DAMAGES

In the fifth and final summarized assignment of error, Judds claims that Hillcrest failed in its effort to prove damages, since it presented no evidence of the difference in value between the roof actually provided and that warranted. Hillcrest claims that the proper measure of damages is the cost of replacing the roof, not the cost of repairing it. Judds further claims, as does Bear, that the damages must in any event be assessed as of the time and place of the breach, not as of some later date.

(a) Difference in Value

Neb. U.C.C. § 2-714(2) (Reissue 1980) provides:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

Notwithstanding that the evidence provides no basis for varying from the usual measure of damages, all of the parties accepted the pretrial order specifying that Hillcrest's damages would be measured by the cost of repairing or replacing the roof. Hillcrest correctly reminds us that issues specified at a pretrial conference control the course of the action and that failure to object to the specifications in the pretrial order waives any right to claim error in that regard. *Misle Chevrolet Co. v. Kometscher*, 225 Neb. 804, 408 N.W.2d 713 (1987); *Malerbi v. Central Reserve Life*, 225 Neb. 543, 407 N.W.2d 157 (1987). See *Reyna Financial Corp. v. Lewis Serv. Ctr.*, 229 Neb. 878, 429 N.W.2d 380 (1988). While that is so, the parties have no right to stipulate as to matters of law, and such a stipulation, if made, is to be disregarded. *Staley v. City of Blair*, 206 Neb. 292, 292 N.W.2d 570 (1980).

With that last-stated rule in mind, the question is whether a pretrial order can control the measure of damages in this case. Bearing in mind that § 2-714(2) in special circumstances permits a measure other than the diminished value, the pretrial order in this case stipulates not as to a rule of law, but as to the existence of special circumstances warranting the use of a measure other than the ordinary one. We thus conclude that in this case the correct measure of damages is either the cost of repairing or of replacing the roof.

(b) Appropriateness of Amount

The essence of Hillcrest's argument as to the inadequacy of its recovery appears to be twofold: first, that it put forward three witnesses who testified that the roof needed to be replaced in order to remedy the flaw, while Georgia-Pacific put forward but one witness who testified that the roof could be recoated,

and that Hillcrest's witnesses had more experience in the construction field; and second, that a 15-year warranty from Holmes is not the same as a new 20-year warranty from Georgia-Pacific.

As to the first argument, it is clear that the trier of fact, being the judge of the credibility of the witnesses, may give greater weight to the testimony of one witness than to the testimony of the greater number of witnesses. *Linch v. Berggren*, 135 Neb. 530, 282 N.W. 528 (1938). Two of Hillcrest's witnesses admitted that they were either unaware of or did not consider the possibility of recoating the roof. The third considered recoating, but would only warrant the new finish for a short time.

Hillcrest's next argument is that a 15-year warranty from Holmes is not comparable to a new 20-year warranty from Georgia-Pacific, and, therefore, basing the measure of damages on Holmes' bid deprives Hillcrest of that for which it bargained, a warranty from an established firm. There are at least three problems with this argument.

First, it is Judds', not Georgia-Pacific's, warranty which entitles Hillcrest to recovery. Second, Hillcrest bargained for but one 20-year warranty. Although Hillcrest's cause of action accrued in November or December 1983 when it discovered the flaking, see § 2-725, the life of the warranty, by its terms, commenced when installation of the roof was completed, sometime in July 1982. Thus, the warranty extended through sometime in July 2002. Holmes' warranty could not begin to run until the recoating was done, and that, so far as the record shows, had not occurred by the time of trial in February 1988. Obviously then, Holmes' warranty would extend through at least February 2003 and thus cover the remaining life of Judds' 20-year warranty. Third, the amount of damages is a factual question which must be determined by the fact finder. Holmes' testimony supports the trial court's finding, and that evidence, the cost of recoating the roof with a product similar to Korad, is reasonably related to the damages proved. Therefore, were it not for the matter discussed below, the trial court's assessment of damages would stand.

### (c) Date of Assessment

Judds and Bear question whether, even when a measure of damages other than the ordinary one set out in § 2-714(2) is appropriate, damages may be calculated as of a date several years after they accrued.

In a recent breach of contract action, *Hansen v. Lien Termite & Pest Control Co.*, 229 Neb. 596, 428 N.W.2d 195 (1988), we held that the cost of repairs necessitated by defendant's failure to discover an infestation of termites was to be assessed as of the time the latent damages were or, by the exercise of reasonable diligence, could have been discovered. In doing so, we rejected the defendant's claim that the damages should be assessed as of the date of its inspection. We also rejected plaintiffs' claim, based on *Rovetti v. City and County of San Francisco*, 131 Cal. App. 3d 973, 183 Cal. Rptr. 1 (1982), a negligence action, that the damages should be assessed as of the date of trial. In declining to follow the *Rovetti* approach, we reasoned that neither party would be unduly penalized by market forces if the damages were assessed as of the time the damages were or reasonably could have been discovered. In this case that date occurred in November or December 1983, when the roof began to flake. Hillcrest knew then that the roof was not performing as warranted and Hillcrest was, as of that time, in a position to explore the reason for and ultimate consequence of the failure and the methods and costs of achieving the warranted performance.

Thus, there is merit to this fifth and final assignment of error. Because Hillcrest succeeded in proving that it was damaged and failed only in establishing the amount of those damages as of the appropriate date, the first suit must be remanded for a new trial on the issue of damages alone. See, *Hansen, supra*; *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988).

### IV. DECISION

For the foregoing reasons, the judgment of the trial court in the first suit is reversed and the cause remanded for a new trial solely on the issue of damages, in accordance with the rules set forth in this opinion. The trial court's judgment of dismissal in

the second suit is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.

HASTINGS, C.J., and GRANT, J., not participating.