NEBRASKA BUILDERS PRODUCTS CO., A CORPORATION, APPELLANT, V. THE INDUSTRIAL ERECTORS, INC., APPELLEE.

478 N.W.2d 257

Filed January 3, 1992.   No. 89-368.

Thomas J. Culhane and Gary L. Hoffman, of Erickson & Sederstrom, P.C., for appellant.

Edward D. Hotz, of Zweiback, Hotz & Lamberty, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Appellant, Nebraska Builders Products Co. (Nebraska Builders), brought this action against the appellee, The Industrial Erectors, Inc. (Industrial), to recover the excess costs of substitute performance on an alleged purchase contract for cranes. Nebraska Builders appeals from a judgment of the trial court declaring that there was no enforceable contract between the parties but that, instead, the parties contemplated a written contract which was never executed. We reverse, and remand for further proceedings.

In reviewing a judgment in a bench trial of a law action, the Supreme Court does not reweigh the evidence but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the

evidence. *Albee v. Maverick Media, Inc., ante* p. 60, 474 N.W.2d 238 (1991). In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Id.* However, when such judgment is not supported by the evidence, it is clearly wrong and must be set aside. *Hammond v. Streeter,* 225 Neb. 491, 406 N.W.2d 633 (1987). Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Knox v. Cook,* 233 Neb. 387, 446 N.W.2d 1 (1989).

The record reflects the following facts: In early 1985, the Omaha Public Power District (O.P.P.D.) invited bids for the construction of a service center near Elkhorn, Nebraska. William Hawkins, on behalf of Nebraska Builders, an Omaha-based company engaged in the business of selling construction products, obtained the plans and specifications which identified supplies, materials, and equipment to be used in the construction of the service center. Nebraska Builders intended to submit its bid as a subcontractor or material supplier to the companies bidding for the general contract for the construction of the service center later that year. Hawkins identified many items in the plans and specifications which Nebraska Builders could potentially supply for the project, including several types of crane systems. Previously, Nebraska Builders had purchased such cranes from Industrial. Industrial is a Chicago-based company which manufactures various types of cranes and also sells cranes manufactured by others.

Hawkins contacted Timothy Brennan, Industrial's sales manager, in February 1985, to inquire if Industrial was interested in submitting a bid on the cranes. Brennan traveled to Omaha on February 28, 1985, to review the plans and specifications for the crane systems. Brennan obtained the information necessary to prepare a bid, including Section 11520 of the specifications—Material Handling and Associated Equipment. The specifications were very detailed, specifying manufacturer, model number, electrical requirements, capacity, speed, control system, and other performance characteristics. Variance in equipment had to be approved in writing by the project engineer pursuant to a procedure set forth in the

specifications. Both Brennan and Hawkins were aware of this procedure.

On March 12 or 13, 1985, Brennan telephoned Hawkins and told him that Industrial would sell and install the crane systems as per specifications for a total sum of $449,920, which consisted of $399,935 for materials and $49,985 for installation. Brennan stated that there were some minor exceptions to the specifications, but those could be worked out with the O.P.P.D. engineer. Nebraska Builders submitted a bid based, in part, on Industrial's bid. On March 26, 1985, Brennan confirmed the telephone conversation with a letter to Hawkins stating Industrial's proposal.

By this letter, exhibit 14, Industrial "propose[d] to furnish all Crane Systems, Jib Cranes and Monorail Systems per Specification #11520 dated 2/26/85 including the three Addendums." Then followed a detailed listing of the specific items which Industrial agreed to furnish at a total material cost of $399,935, plus $49,985 if Industrial was to install the listed equipment.

William Hawkins contacted Hawkins Construction Company (Hawkins Construction), the general contractor with the lowest bid, to see if Nebraska Builders was the low bidder on any of the items Hawkins Construction had bid on. This conversation led to a period of negotiations between Industrial and Nebraska Builders. During the negotiations, Nebraska Builders put together a "package bid" and gave Hawkins Construction a lump-sum price on several items, including the cranes. Nebraska Builders alleges that upon its request Industrial reduced its bid twice. Industrial disputes the second reduction and argues that the bid was only once reduced, by $4,500. However, exhibit 46 consists of a series of adding machine tapes including notations admittedly made by Brennan of Industrial. These tapes indicate a second reduction of $26,937, with additions of $2,400 for each interlock device. As testified to by Hawkins, there were four interlock devices, and this total reduction was therefore $17,337.

At the time Nebraska Builders submitted its package bid to Hawkins Construction, William Hawkins had reviewed Industrial's proposal and knew that the items proposed were

different models made by different manufacturers than those called for in the specifications; however, the proposal stated that Industrial would furnish all crane systems as required by Section 11520 of O.P.P.D.'s specifications. Hawkins was also aware that any deviations needed specific approval. He was not concerned about the deviations, since O.P.P.D. was required to accept alternatives if they were of equal quality. Since Industrial was in the business of manufacturing and selling cranes and had stated that the proposal was per specifications and any deviations from the specifications were "minor," Hawkins believed that the cranes set forth in Industrial's proposal were of equal quality, and thus, approval of the deviations would not be a problem.

During early May, Hawkins was informed by Hawkins Construction that Nebraska Builders' bid on the crane systems, as well as on various other items, was accepted. Hawkins testified that he immediately telephoned Industrial to accept Industrial's offer. He does not remember whether he talked to Brennan or Jerry Cole, the president of Industrial. Brennan testified that he did not have that conversation with Hawkins. Cole did not testify at the trial.

Although Brennan denies his having the conversation in which Nebraska Builders accepted Industrial's bid, Industrial and Nebraska Builders exchanged correspondence concerning the variance approval and exceptions to the specifications between May 31 and August 9, 1985. In a letter dated May 31, 1985, Brennan assured Nebraska Builders that Industrial had adhered to all of O.P.P.D.'s specifications in preparing its bid and that all equipment "will be equal to or better than" the equipment specified in the plans and specifications. Brennan also sent a letter dated June 10, 1985, which starts as follows: "This letter is to confirm our telecon regarding the above subject." The above-named subject in the letter was "Jib Crane, Monorails and Crane Equipment." The letter states further that Industrial is "trying to alleviate the confusion of the materials that Industrial is supplying." Brennan went on to describe the cranes "to be furnished" and concluded by stating that he hoped "this letter will alleviate any confusion regarding the materials to be furnished and we look forward to working with

you on this project." The O.P.P.D. engineers for the district ultimately approved Twin City Monorail (Twin City) and Crane Manufacturing & Service Corporation, Industrial's subcontractors, as crane manufacturers.

During this same time period, Industrial repeatedly requested Nebraska Builders to issue a purchase order, written contract, or letter of intent. Nebraska Builders denied these requests, stating that a written contract would be forthcoming upon its signing a contract with Hawkins Construction. Nebraska Builders never provided Industrial with a written contract. Industrial, in turn, did not issue any written contract or purchase order to any of its suppliers and, in fact, told one supplier that a written purchase order could not be given until Industrial received one from Nebraska Builders.

Despite the fact that there was no written contract, Brennan visited Nebraska Builders' office on August 8, 1985, on behalf of Industrial. Industrial also prepared and submitted shop drawings showing the recommended foundation design and bolt locations for the various floor-mounted jib cranes included in Industrial's proposal.

Brennan sent Hawkins a letter dated July 23, 1985, to confirm a verbal conversation concerning a list of deviations from the specifications, which deviations, if changed to meet the specifications, would constitute an additional cost of an unspecified amount to Industrial's bid. Hawkins testified that he was confused when he received the letter because he had not spoken to Brennan about any deviations to the specifications other than when he got Industrial's oral bid in March 1985. Hawkins discussed the letter with Brennan during Brennan's trip to Omaha on August 8, 1985. Brennan stated that he had not included in Industrial's bid the hoists for the jib cranes and that he had forgotten to include the footwalks and handrails for the largest overhead crane. Hawkins told Brennan that he expected Industrial to supply everything called for in the specifications in accordance with its bid.

Brennan had prepared another letter, dated August 7, 1985, which purported to confirm a telephone conversation between Hawkins and Brennan. The letter informed Hawkins that in order to provide the cranes in accordance with the

specifications "with no exceptions" there would be an additional cost of $167,500 to the original quotation. Brennan testified that the letter was never sent to Hawkins. Brennan further stated that he could not recall the telephone conversation referred to in his letter to Hawkins.

In September 1985, Brennan told Hawkins that Twin City, the company from which Industrial was to purchase some of the cranes, did not want to furnish the cranes. According to Brennan, Twin City felt that the specifications had been drawn up for one manufacturer.

Hawkins became concerned that Industrial was not going to perform under the alleged contract. He telephoned Cole, Industrial's president, to discuss his concerns. Cole assured Hawkins that he would discuss the matter with Twin City and attempt to get it resolved. Brennan informed Hawkins sometime between October 7 and 9 that Twin City had taken several exceptions to the specifications and that as a result Twin City's price to Industrial was going to increase by more than $100,000.

Hawkins went to Chicago on October 14, 1985, to meet with Brennan and Cole to discuss Industrial's problem with Twin City. During the meeting, Brennan and Cole showed Hawkins a breakdown of the original bid and the new costs in view of Twin City's price increase. Hawkins was informed that strict compliance with the specifications would increase the original bid by approximately $150,000, which included extra costs for the jib crane hoists and Twin City's price increase. Hawkins told Industrial that a price increase was not possible. Brennan stated that Industrial would not perform without the price increase. Discussions between Industrial and Nebraska Builders terminated. Nebraska Builders claims to have obtained performance of the contract elsewhere at an additional cost of $136,136.11.

Industrial and Nebraska Builders had no written agreement regarding the time of performance, necessity or amount of a performance bond, time of payment, or whether Industrial would be bound by the terms and conditions of the general contract. However, some of these items were discussed in Industrial's proposal letter. Nebraska Builders and Industrial

contemplated entering into a written agreement which would have addressed such concerns. Hawkins testified that Nebraska Builders has a standard subcontract form which includes such terms as a complete description of work, approved variances, price, terms of payment, time of performance, performance bond, and adherence to the terms of the general contract.

The parties stipulated at trial that the dispute would be governed by the Uniform Commercial Code. Following a trial and submission to the court without a jury, judgment was entered in favor of Industrial.

In order for one to more clearly understand the issues in this case, it may be helpful to set forth that portion of the district court's order which contains its findings:

The Court finds that no contract existed between Nebraska Builders Products and Industrial Erectors. The Court finds that the parties had negotiated to enter into an agreement at a later time which would include among other items the delivery dates, payment schedules and specific waivers of general contractor's written requirements and specifications. In fact, each of the parties contemplated a written contract which was never entered. Fleming Co. of Nebraska v. Michals, 230 NW 2d 753 [sic] (1988), Nebraska Seed Co. v. Harsh, 98 Neb. 89, 154 [sic] NW 310 (1915). A contract was not present in this case as a matter of law and facts.

Nebraska Builders' five assignments of error can be summarized as follows: (1) The decision of the trial court is not supported by the evidence and is contrary to law; (2) the trial court erred in deciding there was no enforceable contract because the parties intended to execute a written contract at some point in the future; and (3) the trial court misapplied the Nebraska U.C.C. in its determination that no valid enforceable contract existed between Nebraska Builders and Industrial in that there was no agreement on incidental terms.

Since the parties stipulated at trial that the U.C.C. governed the dispute, this court will presume that the U.C.C. controls the case. Because of its citation to *Michals* and *Harsh* in its order, it is quite apparent that the trial court decided this case on common-law grounds and not under the U.C.C. In doing so,

the district court erred.

This court has previously decided that if a contract involves both the sale of goods and services, and the parties have presented the case to the trial court and the Supreme Court on the theory that the sales article of the U.C.C. applies, this court will dispose of the case on appeal on that theory. See, *Hammond v. Streeter*, 225 Neb. 491, 406 N.W.2d 633 (1987); *Sesostris Temple Golden Dunes v. Schuman*, 226 Neb. 7, 409 N.W.2d 298 (1987).

The first issue to be determined is whether a contract was formed between the parties. Neb. U.C.C. § 2-204 (Reissue 1980) on formation of a contract states:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

A contract may be found in the bargain of the parties by their language or by implication from other circumstances, such as course of dealings or usage of trade. *Crane Co. v. Roberts Supply Co.*, 196 Neb. 67, 241 N.W.2d 516 (1976). See, also, Neb. U.C.C. § 1-201(3) (Reissue 1980).

The conduct of the parties in the case before us would support a finding that a contract existed. Industrial submitted an oral proposal to Nebraska Builders to supply cranes for the service center in telephone calls on March 10, 1985, and on March 12 or 13. Later, Industrial confirmed the offer in a letter dated March 26, 1985, written to Hawkins by Brennan, as sales manager of Industrial. That letter consisted of seven pages and was quite explicit. It stated in part:

This letter is to confirm our telecom regarding the above subject. Per that telecom, we are pleased to propose the following.

> IEI proposes to furnish all Crane Systems, Jib Cranes and Monorail Systems per Specification #11520 dated 2/26/85 including the three Addendums.
>
> We also propose to furnish the following: [There then followed a detailed listing and description of 14 different cranes and a machine shop monorail.]

There then followed a statement that the material price on the above items would be $399,935, with an additional cost to install those items of $49,985. The letter went on to state:

> Our quotation is based on delivery of all items of equipment and materials so that work can proceed in a proper sequence of erection.
>
> Our prices does [sic] not include applicable taxes on materials and freight charges to jobsite. Terms are to be negotiated prior to acceptance of order. Delivery is to be schedule [sic] with the erection of building.

Included within exhibit 14 were four pages of detailed specifications, including what was termed a "Clearance Sketch."

Nebraska Builders relied on the bid contained in the telephone calls and letter in submitting its own bid as a material supplier on the project. Immediately after Hawkins learned that Nebraska Builders' bid had been accepted by the general contractor, Hawkins stated, he called Industrial and accepted the offer. Brennan, however, denies his having this telephone conversation.

A review of the facts in a light most favorable to Industrial, the prevailing party, would support a finding that the offer was never orally accepted by telephone. However, Industrial's conduct in submitting the information and shop drawings and the correspondence between Industrial and Nebraska Builders concerning the variance approval contradicts such a finding. In addition, Brennan also visited Nebraska Builders' office on August 8, 1985, almost 5 months after the alleged agreement was made, to answer questions on the crane systems that Industrial would supply.

The written proposal, the exchange of information on the project, and the oral conversations between Nebraska Builders and Industrial manifest the intent that a contract existed

between the parties.

The next issue to be decided is whether the contract fails for indefiniteness. The trial court in the case at hand found that the parties had negotiated to enter into an agreement at a later time which would include among other items the delivery dates, payment schedules, and specific waivers of the specifications, and that as a result there was no contract. The trial court cited the cases *Fleming Co. of Nebraska v. Michals*, 230 Neb. 753, 433 N.W.2d 505 (1988), and *Nebraska Seed Co. v. Harsh*, 98 Neb. 89, 152 N.W. 310 (1915). *Michals* and *Harsh*, however, are not controlling in determining what constitutes an enforceable contract under the U.C.C., since they construe contracts formed under common law.

According to § 2-204(3), a contract does not fail for indefiniteness because a term is left open, as long as the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. Cf. *Zimmerman v. Martindale*, 221 Neb. 344, 377 N.W.2d 94 (1985) (when an agreement not covered by the U.C.C. stipulates that certain terms will be settled later by the parties, such terms will not become binding unless and until they are settled by later agreement). The U.C.C. allows the courts to supply reasonable terms for those that are missing. See Neb. U.C.C. §§ 2-305 (Reissue 1980) (price), 2-308 (Reissue 1980) (place of delivery), 2-309 (Reissue 1980) (time of delivery), 2-310 (Reissue 1980) (payment terms), 2-503 (Reissue 1980) (tender by seller), 2-509 (Reissue 1980) (risk of loss), 2-511 (Reissue 1980) (tender by buyer), and 2-513 (Reissue 1980) (buyer's inspection). The official comment to § 2-204 states:

> If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this act making provision elsewhere for

missing terms needed for performance, open price, remedies and the like.

The only necessary term to satisfy the definiteness requirement under the U.C.C. is the quantity. See Neb. U.C.C. § 2-201(1) (Reissue 1980). But see Neb. U.C.C. § 2-306 (Reissue 1980). In the case at bar, the quantity requirement was satisfied, since the proposal letter listed the materials to be furnished, i.e., 14 cranes and 1 monorail. Since the conduct of the parties indicated that the parties intended to make· a contract, the requirements of § 2-204(3) have been met, and the contract is not indefinite. The fact that the parties intended to execute a written agreement in the future is immaterial in this case, since the U.C.C. focuses on the parties' conduct. The trial court was therefore clearly wrong in finding that no enforceable contract existed.

Industrial argues that the formation of any contract would have been conditional upon approval of the variances, since both parties knew that the equipment proposed contained variances that required written approval from the project engineer. This argument fails. An enforceable contract can be formed and still retain a condition to performance of that contract. See, *Hahn v. International Management Services, Inc.*, 207 Neb. 229, 298 N.W.2d 140 (1980); *Bellevue College v. Greater Omaha Realty Co.*, 217 Neb. 183, 348 N.W.2d 837 (1984). In other words, contrary to what Industrial contends, it is the performance of the contract that is conditional, not the formation.

A condition is excused if the occurrence of the condition is prevented by the party whose performance is subject to the condition. *Hahn, supra*. In *Hahn*, the parties entered into an agreement for the purchase of real estate conditioned upon the buyer entering into an agreement to complete a nursing home for the price that had been quoted by the seller, to protect the buyer against increases in labor and material costs. The court found that the buyer was under a duty to make a good faith effort to enter into an agreement. The failure of the buyer to make such an effort excuses the condition. Since Industrial never obtained variance approval but elected not to perform instead, it cannot use the condition as a defense to

performance.

First, the proposal letter stated that the materials to be provided would meet specifications. The materials did not meet specifications as promised. It was up to Industrial to attempt to meet the specifications. Second, O.P.P.D. was required to accept any materials of equal quality. Industrial by its May 31, 1985, letter promised all materials would be of equal quality to or better quality than the equipment specified. Therefore, approval should not have been a problem. Finally, Industrial elected not to perform under the contract rather than continue to seek variance approval.

The last issue argued by Industrial is that Nebraska Builders' action is barred by the statute of frauds. Section 2-201 of the U.C.C. states the formal requirements of the statute of frauds:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

. . . .

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted . . . .

Since the value of the cranes exceeds $500, the statute of frauds is applicable. Therefore, we turn to the question whether the requirements of the statute of frauds have been met. In the case *Veik v. The Tilden Bank*, 200 Neb. 705, 265 N.W.2d 214 (1978), a letter was found to be sufficient to satisfy the requirements of the statute of frauds. This court stated that a

writing will be sufficient to avoid the U.C.C. statute of frauds if the writing evidences a contract for the sale of goods, is signed by the party against whom enforcement is sought, and specifies a quantity. The required writing need not contain all the material terms of the contract. According to comment 1 to § 2-201, the writing needs only to afford a basis for believing that the offered oral evidence rests on a real transaction.

Several writings can be pieced together to satisfy the requirement, even though the writings taken alone would not have been sufficient. See, *Reich v. Helen Harper, Inc.*, 3 U.C.C. Rep. Serv. (Callaghan) 1048 (N.Y. City Civ. Dec. 27, 1966) (a sales confirmation and an invoice sent by the seller's agent to the buyer, combined with a letter by the buyer criticizing the quality of the goods, satisfy the writing requirement of § 2-201(1)); *Waltham Truck Equip. Corp. v. Massachusetts Equip. Co.*, 7 Mass. App. 580, 389 N.E.2d 753 (1979) (three separate letters signed by a representative of the buyer can be read together to satisfy the statute of frauds, even though two letters indicated a dispute as to one of the terms of the contract).

In the case at bar, the proposal letter and the followup letters indicate that a contract was formed. The proposal letter of March 26, 1985, begins with the following sentence: "This letter is to confirm our telecom regarding the above subject [i.e., 'Jib Cranes and Monorails']." The letter states the quantity of the goods to be furnished; the items, 14 cranes and 1 monorail, are listed in detail. After the alleged phone conversation in which Nebraska Builders accepted Industrial's bid, a correspondence between the two parties emerged concerning the materials to be furnished. A letter sent by Brennan dated May 31, 1985, assures Nebraska Builders that Industrial has adhered to the plans and specifications required by O.P.P.D. In a subsequent letter dated June 10, 1985, Brennan states that Industrial is "trying to alleviate the confusion of the materials that Industrial *is supplying*." (Emphasis supplied.) The letter refers to the included brochures, which "show that the equipment *to be furnished* meets the standards and quality [required by O.P.P.D.]." (Emphasis supplied.) The letter ends as follows: "We hope this letter will alleviate any confusion regarding the

materials to be furnished and *we look forward to working with you on this project.*" (Emphasis supplied.)

On August 9, 1985, Brennan sent another letter to Nebraska Builders in which he "assume[s] that the hoist/trolley units will be furnished by others or would be an adder to the *contract.*" (Emphasis supplied.) Finally, on August 15, 1985, Brennan sent Hawkins a letter in which he recommends a certain foundation for the bolt setting of the mast-type jib crane. The letter includes several drawings. The drawings were returned to Industrial with notes and corrections on them made by Nebraska Builders' architect.

The three requirements of the statute of frauds § 2-201 are satisfied when the five letters are read together. First, the letters clearly evidence a sale of goods. Second, the writings are signed by the authorized agent of the party against whom enforcement is sought. In the case at hand, enforcement of the contract is sought against Industrial, and the letters are all signed by Brennan, who had the authority to contract on behalf of Industrial. Last, the quantity of the goods to be sold is indicated in the letter dated March 26, 1985, which describes in detail 14 cranes and 1 monorail.

The agreement is also enforceable, since the case falls within the statute of frauds exception of § 2-201(3)(b). According to § 2-201(3)(b), oral contracts may be enforced absent a writing "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made . . . ." Comment 7 to § 2-201 states that "it is no longer possible to admit the contract in court and still treat the statute as a defense."

Section 2-201(3)(b) contains the following three requirements: There must be an admission; the admission must be made by the party against whom enforcement of the oral contract is sought; and the admission must be made in court.

An admission within the meaning of § 2-201(3)(b) can be made "when the party denying the existence of the contract and relying on the statute takes the stand and, without admitting explicitly that a contract was made, testifies to facts which as a matter of law establish that a contract was formed." See *Lewis v. Hughes*, 276 Md. 247, 256-57, 346 A.2d 231, 236 (1975).

A compelled or involuntary admission of the existence of an oral contract, obtained during cross-examination at trial, may be relied upon to satisfy § 2-201(3)(b). See, *Lewis, supra*; *Dangerfield v. Markel*, 252 N.W.2d 184 (N.D. 1977), *appeal after remand* 278 N.W.2d 364 (N.D. 1979); *Meylor v. Brown*, 281 N.W.2d 632 (Iowa 1979); *Franklin Cty. Co-op. v. MFC Services (A.A.L.)*, 441 So. 2d 1376 (Miss. 1983); *M & W Farm Serv. Co. v. Callison*, 285 N.W.2d 271 (Iowa 1979). The statutory requirement can be satisfied by way of pleadings, bills of particulars, depositions, affidavits, admissions pursuant to notices to admit, and oral testimony, including admissions made on cross-examination. See *Reissman Int'l Corp. v. J.S.O. Wood Products*, 10 U.C.C. Rep. Serv. (Callaghan) 1165 (N.Y. Civ. June 6, 1972).

Brennan made the following admission while being cross-examined:

Q At the meeting on October 14th in Chicago you specifically told Mr. Hawkins, did you not, either you or Mr. Cole, that Industrial Erectors would not perform or supply any cranes on this project unless it received compensation somewhere in the neighborhood of $150,000.00 more than that set forth in its bid, isn't that correct?

A I believe it was stated, if the order was to be as per specified with the electrical circuitry and everything else, that there would be an increase *to the contract*.

Since Industrial disputes the fact that there was a meeting of the minds, and Brennan's testimony establishes the existence of a contract, his testimony should be considered an admission.

This case is very similar to *Ursa Farmers' Cooperative v. Trent*, 58 Ill. App. 3d 930, 374 N.E.2d 1123 (1978). In *Trent*, the defendant denied the making of a contract, but admitted at trial that he had testified during a discovery deposition: " 'Whoever I talked to, I contracted 2500 bushels of beans,' " and " 'I signed up for 2500 bushels of beans at [$]4.01.' " *Id.* at 931, 374 N.E.2d at 1124. The court held that the trial court properly concluded that the defendant had made an in-court admission of an oral contract for the sale of beans. We hold that similarly in this case Brennan's testimony, considering the circumstances

presented at trial, established the existence of an oral contract.

We do not hereby hold that an admission is made whenever the defendant utters the magic words contract or agreement. We acknowledge the possibility that laypeople might misuse legal terminology. We therefore suggest that if a party denying the existence of a contract uses contractual terminology, the court should look at the other evidence presented by the defendant. The record in this case shows that Brennan admitted submitting variance approval documents to Nebraska Builders shortly after the alleged agreement occurred. He also admitted that he sent a letter advising Nebraska Builders that Industrial would adhere to the specifications. In addition, Brennan testified that he visited Omaha and was looking for more commitment from Nebraska Builders in the form of a letter of intent or purchase order. Brennan's conduct indicates that an agreement between the parties existed. See *Quaney v. Tobyne*, 236 Kan. 201, 689 P.2d 844 (1984) (an admission can be established through verbal admission and conduct). In light of Brennan's conduct we consider the testimony previously quoted to be an admission, and not an inadvertently mistaken use of legal terminology.

The second requirement, that the admission be made by the party against whom enforcement is sought, is also satisfied, since Brennan made the admission on behalf of Industrial.

Last, the admission must be made in court. In *Wilke v. Holdrege Coop. Equity Exchange*, 200 Neb. 803, 265 N.W.2d 672 (1978), this court held that the exception of § 2-201(3)(b) did not apply to a letter of compromise written by plaintiff's attorney to the manager of the defendant, since the admission was not made in the pleading, testimony, or otherwise in court. The case at hand, however, is distinguishable from *Wilke*, since Brennan admitted to a contract during his testimony at trial. In *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 244 N.W.2d 86 (1976), we held that a letter confirming the oral agreement was not within the exceptions enumerated in § 2-201(3). The letter in *Farmland Service Coop* was referred to in a deposition, but never offered or received into evidence. The admission in the case at bar, however, was made by Brennan during his cross-examination at trial and thus offered into evidence. As a result the case falls within the exception to the

statute of frauds, and Industrial can therefore not use § 2-201 as a defense. The rationale is that the statute of frauds was not designed to protect a party who made an oral contract, but, rather, to aid a party who did not make a contract though one is claimed to have been made orally with him. See *Reissman Int'l Corp., supra.*

The district court's finding that no contract existed was based on an erroneous application of the law controlling this case. As previously mentioned, the parties stipulated at trial that the case was governed by the U.C.C. Even if the parties had not made this stipulation, the case should have been decided under the U.C.C., since the predominant factor of the alleged contract was the sale of goods. See *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.,* 219 Neb. 303, 363 N.W.2d 155 (1985) (to determine whether a contract which involves both the sale of goods and services falls within the coverage of the U.C.C., the court looks at the predominant factor of the contract). Therefore, the judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.