**T.O. HAAS TIRE COMPANY, INC., A NEBRASKA CORPORATION,
APPELLANT AND CROSS-APPELLEE, V. FUTURA COATINGS, INC., A
FOREIGN CORPORATION, APPELLEE AND CROSS-APPELLANT.**
507 N.W.2d 297

Filed September 14, 1993.    No. A-91-056.

Steven E. Guenzel, of Barlow, Johnson, DeMars & Flodman, for appellant.

R. Kent Radke for appellee.

MILLER-LERMAN and WRIGHT, Judges, and NORTON, District Judge, Retired.

NORTON, District Judge, Retired.
T.O. Haas Tire Company, Inc. (Haas), plaintiff in the original action, appeals from an award of $6,000 against Futura Coatings, Inc. (Futura), by the district court for Lancaster County, Nebraska, in which the trial court found a breach of an express warranty on Futura's roof materials used by Haas to coat the roof on a new building. Haas alleges two errors: (1) the trial court's finding that the roof could have been repaired at any time at a cost of $6,000 and (2) the trial court's refusal to find that the actual cost of repair, that being $46,000 plus $6,000 for comparable insulation, was the proper measure of damages. Futura cross-appeals, alleging four errors: (1) the trial court's finding that the greater weight of the evidence in this case indicates that Walter Stansky did inspect the roof and that he approved the installation; (2) the trial court's finding that all conditions precedent for the creation of an express warranty were met; (3) the trial court's finding that the defective workmanship should have been discovered by Stansky when he

inspected the roof, at which time the defect could have been corrected; and (4) the trial court's finding that because Stansky approved the installation of the coating, Futura cannot complain that the installation workmanship was poor. We affirm in part, and in part reverse and remand for a new trial on the issue of damages.

During the summer of 1983, Haas constructed a warehouse and office building at 640 West O Street in Lincoln, Nebraska. During construction, Haas engaged PMS, Inc., a roofing business which is no longer operational, to complete the roof of the building, which measured 120 feet by 220 feet. PMS was to cover the steel decking of the roof with approximately 1 inch of urethane foam and then apply a substance called 500/550, manufactured by Futura, over the foam. The purpose of the final application was to provide a watertight film or shield. The steel decking was supported by steel bar joists. The flutes, or ridges, in the decking ran perpendicular to the slope of the roof. PMS was a qualified applicator for Futura products.

Kerry Donovan, former president of PMS, testified that he recommended using the Futura 500/550 coating because it was supposed to be resistant to ponding and because the horizontal flutes in the steel decking were prone to pond water. In addition, Donovan stated that he would not have recommended the Futura system without the warranty, which appears to have been for a 5-year term, renewable for another 5 years under certain terms and conditions.

Donovan testified that Futura was aware that the Haas building had flutes running perpendicular to the slope of the roof. Haas submitted a proposed design of the roof to Futura with its request-for-warranty form. Donovan further testified that while installing the roof, his work crew followed the recommendations from Futura, which included removing the oily protective finish from the metal decking so that the foam would adhere and installing foam in the lower areas of the flutes to avoid crevice or crack creation. He also testified that during the application of the 500/550, and in compliance with the warranty process, Stansky, an employee of Foam Enterprises, Inc., which furnished products used in this project, made the required inspection for Futura. This

particular testimony was substantiated by other witnesses. Stansky regularly acted as a representative of Futura in making roof inspections. According to some of the evidence, Stansky was in Nebraska in August 1983 to visit another PMS project site. At that time, approximately 90 percent of the 500/550 coating had been applied. The evidence further indicates that Stansky "walked around and he took several slit samples and measured with some type of a device, a micrometer, or something. He measured the thickness of the coating, the [sic] measured the foam, he checked the foam for adhesion, et cetera." According to Donovan, Stansky indicated that some additional coating was needed and Donovan was given the impression that the roof would be "fine" after the corrective action was taken. The roof coating was completed in 1983.

Stansky, who was present and testified at trial, said that the inspection never occurred, alleging that the only trip he made to the Haas building was in July 1983, at which time only 75 percent of the steel decking had been installed. He also testified that he was personally unaware of the direction in which the flutes on the deck were running. Additionally, he testified that it was the policy of Futura not to perform a final warranty inspection until the company had been paid moneys owed to it and that PMS had an outstanding balance due to Futura at the time of the alleged inspection because of a returned check. A written warranty was never received by Haas.

During the summer of 1984, moisture apparently penetrated the 500/550 covering and the foam and leaked into the interior of the Haas building. Haas contacted Futura requesting an inspection of the roof for warranty purposes. Jeff Jarboe, from Futura, responded by coming to Lincoln in July 1984. At that time, he inspected the roof, identified certain problems, and denied that Futura had any responsibility because no warranty had ever been issued.

Between 1984 and 1989, and after Jarboe had informed Haas that Futura would assume no responsibility, Haas looked into various alternatives for repairing the roof. Each of the several contractors who were contacted recommended removing the existing roof and beginning again, based on the reason that no one would issue a warranty if the roof were simply patched or

repaired.

In 1986, Donovan inspected the roof. He testified that the problems he observed were the result of the failure of the 500/550 coating. He came to this conclusion because rust holes in the steel decking corresponded with ponded water areas. He also testified that the water rendered the entire roof useless because water-saturated insulation loses all of its insulating value.

In 1988, Michael Applegarth, a contractor, inspected the roof. He testified that he determined from the inspection that the coating "was leaking and the whole roof was a problem. It was leaking all over and it wasn't doing what it was supposed to be doing, which was shedding the water." He further testified that the coating was breathing, i.e., water and air were being taken in and pushed out through the coating, the foam acting as a sponge. It was his recommendation that the covering and wet foam be stripped from the roof, that stockboard be installed over the decking, and that a modified membrane be installed over the stockboard. Haas entered into a contract with Applegarth to replace the roof for $46,000.

According to Applegarth, once he began removing the wet foam, he discovered rust holes in the steel decking, some "as large as your foot," and "there was [sic] as many as 15 or 20 in an area half the size of this [court]room." He also noted that there were stress cracks in the foam directly above the seams where the steel decking had been spliced. These cracks were probably formed when the decking expanded and contracted with changes in temperature. He felt that the rust under the foam was caused by water "coming in through that stress crack."

Charles Stokes, a urethane contractor who examined the roof in 1984, and Jarboe gave additional testimony suggesting that PMS had applied the foam in an inadequate fashion and had mixed and applied the 500/550 coating improperly.

At the conclusion of the trial, the district court specifically found that "Futura offered an express warranty against the failure of its coating system for five years." Further, the court found that this warranty required two conditions precedent: (1) Before construction, the contractor was required to provide

Futura with construction information and (2) the installation of the Futura coating system had to be inspected and approved by a representative of Futura.

Initially, we note several rules with regard to our scope of review. In reviewing a judgment under appeal regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court. See *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992). Where the evidence is in conflict, an appellate court will give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989). In reviewing a judgment in a bench trial of a law action, an appellate court does not reweigh evidence but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *City of LaVista v. Andersen*, 240 Neb. 3, 480 N.W.2d 185 (1992); *Nebraska Builders Prod. Co. v. Industrial Erectors, supra*; *Metropolitan Utilities Dist. v. Pelton*, 236 Neb. 66, 459 N.W.2d 193 (1990). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *City of LaVista v. Andersen, supra*; *Nelson-Holst v. Iverson*, 239 Neb. 911, 479 N.W.2d 759 (1992); *Nebraska Builders Prod. Co. v. Industrial Erectors, supra*.

There are three principal issues involved in this case, i.e., whether or not a warranty existed, the proximate cause of the damage to the roof, and the amount of damages involved.

With respect to the warranty, we conclude that the Futura 500/550 coating meets the definition of "goods" under the Uniform Commercial Code-Sales and is, therefore, subject to the rules and regulations therein. See, Neb. U.C.C. § 2-102 (Reissue 1992); *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985) (U.C.C. applied to a warranty for a roofing system because the principal purpose of the contract was the sale of goods, even though some installation was required for the goods to be utilized). By

the terms of Neb. U.C.C. § 2-313(1) (Reissue 1992), an express warranty may be created by a seller as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

The existence and scope of an express warranty under the U.C.C. are ordinarily questions to be determined by the trier of fact. *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 461 N.W.2d 55 (1990). In this case, the court was the trier of fact, and its factual findings will not be set aside unless clearly wrong. See *Howells Elevator v. Stanco Farm Supply Co.*, 235 Neb. 456, 455 N.W.2d 777 (1990).

As previously noted, following trial the court specifically held that Futura had conferred an express warranty against the failure of its coating system. In finding an express warranty, the court impliedly found that the warranty was the basis of the bargain, as required in § 2-313, and explicitly found that the two conditions precedent had been met. We review these findings only to determine whether they are clearly wrong, and we give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Miles v. Miles, supra.*

The evidence would indicate that PMS and Haas chose to use the Futura 500/550 system, at a greater expense to Haas, specifically because it was warranted to resist ponding and to bear up well under the elements and because the total warranty was for a 10-year term. This evidence is sufficient to support the trial court's finding that PMS and Haas provided Futura with construction information. This point is not in dispute. The evidence shows that Futura approved the plans sent to it, with some suggestions added. Next, the trial court considered the

issue of whether or not the roof had been inspected and approved in August 1983. While the record reflects conflict with regard to whether or not Stansky, as an inspector for and a representative of Futura, was in Lincoln and actually performed the inspection as claimed, there is testimony that supports the finding by the trial court that he did inspect and approve the roof. The trial court heard the evidence and observed the witnesses, and we cannot say that its finding is clearly wrong. Therefore, we find that the trial court did not err when it determined that the roof was under an express warranty from Futura.

■ The second issue relates to the question of proximate cause. In order for a plaintiff to recover on a breach of express warranty, he must show, among other things, that " 'the goods did not comply with the warranty, that is, that they were defective, and that his injury was caused by the defective nature of the goods.' " *Delgado v. Inryco, Inc.*, 230 Neb. 662, 666-67, 433 N.W.2d 179, 183 (1988), quoting *Durrett v. Baxter Chrysler-Plymouth, Inc.*, 198 Neb. 392, 253 N.W.2d 37 (1977).

Haas alleged that Futura breached the following express warranties:

a. That the Futura Flex 500, with Futura Flex 550, was resistent [sic] to hail, mechanical damage, and roof traffic;

b. That the Futura coatings system would have excellent resistence [sic] to the elements and retention of properties over long periods of time; and

c. The coating system was warranted against failure for a period of ten years.

Futura argues that the failure of the roof was not caused by a breakdown of the 500/550 coating, but, rather, by improper mixture and application of the coating and a faulty roof design. Haas provided conflicting evidence that the damage to the roof was directly related to the failure of the Futura coating.

■ Generally, the issue of proximate cause is for the finder of fact. See *Bourke v. Watts*, 223 Neb. 511, 391 N.W.2d 552 (1986). Two plausible alternative and conflicting theories of causation were presented by the evidence, and the district court was not clearly wrong in adopting one version over the other.

Therefore, even if the evidence could support a finding that the damage was caused by faulty design, the trial court had sufficient evidence upon which to base its decision that it was the failure of the 500/550 coating that proximately caused the damage to the roof.

By reason of the fact that we have determined that there was sufficient evidence to find proximate cause, we do not need to address the question of whether Futura waived its right to object to the application of its coating and the structure by approving a warranty. We once again note *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985), which addressed this issue. Also, by analogy, because of the fact that the court determined that an inspector approved the roof before the issuance of a warranty, we find sufficient evidence for the conclusion that Futura expressly warranted adequacy of the structure and the application of the 500/550 coating. As in *Mennonite Deaconess Home & Hosp.*, Haas "was not purchasing raw material. It was purchasing a roofing system which was partially dependent upon proper installation." See *id.* at 314, 363 N.W.2d at 163.

■ Turning to the issue of damages, we must determine the proper measure in this case. The roof was warranted under a contract for goods. The measure for such a matter is found in Neb. U.C.C. § 2-714 (Reissue 1992):

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

An examination of the evidence disclosed no special circumstances to change the measure set forth above. Reference is had to *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 461 N.W.2d 55 (1990), where the Supreme Court found no special circumstances, despite the fact that the parties had agreed to a different measure of damages at a pretrial conference and were bound to use that standard.

■ In this case, the trial court measured damages as "[t]he cost of repair of the roof at the time nearest to the time of

completion and discovery of the defects." However, the court made no specific findings with regard to why this measure was appropriate, and we conclude that the proper measure is that set forth in § 2-714. Having so found, we must then determine what the difference was between the value of the roof at the time of acceptance in August 1983 and the value of the roof if it had been as warranted. In connection with this, we note that the district court concluded that the *cost* of the roof when completed was $33,000. (See exhibit 1.) However, exhibit 2 sets forth the proposal of PMS which was eventually accepted by Haas. This obvious error combined with other determinations by the trial court might have had a tendency to prejudicially affect Haas' interests in this case. Plain error, to be noted, must be of such a nature that it prejudicially affects a litigant's substantial right and, if uncorrected, would cause a miscarriage of justice or damage the integrity, reputation, and fairness of the judicial process. See *State v. Wilcox*, 239 Neb. 882, 479 N.W.2d 134 (1992). We note the error and find that the *cost* of the roof, as opposed to the value of the roof as warranted, was $50,800.

Obviously, the problem in this case lies in determining the value of the roof at the time of acceptance. While the cost was $50,800, Haas urges us to find that the roof had no value whatsoever for the purpose for which it had been built when it was completed. Haas relies on *Moss v. Speck*, 209 Neb. 46, 306 N.W.2d 156 (1981). In that case, a house could not be issued an occupancy permit because the roof was faulty and the house was totally without value for the purpose for which it was intended. However, unlike *Moss*, in this case the Haas building served its function as a warehouse for tires for approximately 5 years before the roof was reconstructed. In addition, *Moss* was based on a construction contract and, therefore, was not governed by the U.C.C.

The measure set forth in § 2-714 is the equivalent of what is known as the diminished value rule. In order to determine the diminished value of a structure, the cost of replacement or repair is an element to take into consideration in arriving at the value under some circumstances. See *Plante v. Jacobs*, 10 Wis. 2d 567, 103 N.W.2d 296 (1960). In this case, the cost of

replacement at the time of acceptance would be the contract price of $50,800. However, using replacement value as a measure of damages would unjustly enrich Haas because the building did, in fact, have some value for warehouse purposes and had apparently served that purpose for a period of time.

There is some evidence that the cost to repair the roof at the time it began to leak was $6,000. At trial in 1990, Jarboe, an officer of Futura, testified that in his opinion it would have cost that amount to repair the roof when the defects were first discovered. This opinion was based on his visual inspection in 1984, at the time Futura disclaimed liability. Jarboe was the only witness to give such a low cost estimate. Jarboe testified that in his opinion the roof structure was "85 to 90 percent in good shape" at the time of the inspection and that to repair 15 percent of the area would cost about $6,000. However, he also admitted that when he inspected the roof he was looking for mixing problems and pinhole problems in the coating and that he was not aware of or did not notice the more serious problems presented by the failure of the coating system on the sides of the flutes or the stress cracks. On cross-examination, he stated that if the problems addressed at trial prevailed throughout the entire roof, the situation would have been larger and that $6,000 would not correct the matter. Jarboe did acknowledge that any foam that was wet would have to be removed. All of the other contractors who subsequently inspected the roof recommended tearing off the foam covering and constructing a new roof over the decking. Haas now argues that the weight of the evidence goes against Jarboe's testimony.

It is well established that the factual findings of a trial court in a law action tried without a jury have the effect of a finding of a jury on appeal and will not be set aside unless clearly erroneous. After a review of the entire damage issue, it would appear that the trial court's finding that $6,000 would have effectively repaired the roof in 1984 was based on clearly erroneous evidence, and therefore, the judgment awarded was also erroneous. On that basis, we cannot affirm the conclusions of the trial court as to the damage suffered by Haas. Neither can we find credible evidence in the record on which we could base any estimate of the actual amount which might have been

required to return the roof to its warranted value at the time of discovery of the damage. Any determination by this court in that regard would be speculative in nature. For that reason, we reverse on the issue of damages and remand the cause for retrial on the question of the amount required to return the roof to its warranted value ($50,800) at the time of the discovery of the damage.

Turning to the question of the cross-appeal, we find no merit in the four errors assigned. All are addressed in the preceding discussion, either specifically or by implication. It would serve no useful purpose to restate each in detail. The cross-appeal is dismissed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL
ON THE ISSUE OF DAMAGES.